

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NO. PD-1097-08

**CHRISTOPHER IRBY, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE FIFTH COURT OF APPEALS
### DALLAS COUNTY

COCHRAN, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, JOHNSON, and KEASLER, JJ., joined. HOLCOMB, J., filed a dissenting opinion, in which WOMACK and HERVEY, JJ., joined. PRICE, J., dissented.

### OPINION

In this case we hold that a defendant must show some causal connection or logical relationship between a witness's probationary status and his potential bias to testify favorably toward the State before the witness may be cross-examined with that status.[1] Evidence that

---

[1] The appellant's sole ground for review reads as follows:
Whether the Court of Appeals properly applied the Sixth Amendment, as interpreted by the United States Supreme Court, to the question of whether the trial court's refusal to permit the victim to be cross-examined about a case for which he was on probation

a witness with a juvenile record might be testifying because of a need to "curry favor" with the State or shift suspicion away from himself is constitutionally relevant and admissible under the Confrontation Clause.[2]  But the mere fact that a witness is on probation is not sufficient, by itself, to establish a potential bias or motive to testify.  We therefore affirm the court of appeals.[3]

I.

**A.     Trial Proceedings.**

Appellant was charged with the sexual assault of W.P., a sixteen-year-old child, enhanced with a prior conviction for indecency with a child.

Before trial, appellant's counsel told the trial judge that he wanted to cross-examine W.P. about the fact that he was on deferred-adjudication probation for aggravated assault with a deadly weapon.  He stated that W.P.'s "vulnerable status" was relevant to show bias and motive under *Davis v. Alaska*.[4]  The trial judge deferred his ruling because he had not yet heard any of the facts.  During the trial, the judge gave the defense two more hearings outside the presence of the jury to show a plausible connection between W.P.'s "vulnerable status" and a possible bias or motive to fabricate his story, but the judge ultimately

---

violated Appellant's constitutional rights to confrontation.

[2] *Davis v. Alaska*, 415 U.S. 308, 317-18 (1974).

[3] *Irby v. State*, No. 05-07-00958-CR, 2008 Tex. App. LEXIS 4544 (Tex. App.—Dallas 2008) (not designated for publication).

[4] 415 U.S. 308 (1974).

disallowed the proposed cross-examination. He concluded that W.P.'s "juvenile records" were irrelevant to show a possible motive to fabricate because the two matters were "completely separate."

W.P. testified that he was sixteen years old in January of 2005. He worked part-time for his contractor-father, Bobby, after he was expelled from school.[5] W.P. first met appellant sometime around January 8th, when his friend, James, asked appellant if the boys could do some cleaning work for him. Appellant agreed and put W.P. and James to work cleaning blinds at a lady's house. Afterwards, appellant had the boys spend the night in his apartment. James had appellant buy some "Apple Pucker" alcohol to celebrate James's birthday. W.P. had never drunk much alcohol before, but he thought it was "cool" to sit around drinking with James and appellant. W.P. and James got drunk and threw up. Afterwards, W.P. lay down on a futon, while James stretched out on the floor. After James fell asleep, appellant put a "hardcore porno" videotape in the TV and came over to W.P. and asked if he could "help" him. W.P. didn't know what he meant. But then appellant "kind of pulled the covers off of me and he came down and started to mess with my penis . . . . He eventually sucked my penis." W.P. pushed him away, turned over, and went to sleep.

The next morning W.P. did not say anything to appellant because he "was freaked out and [he] didn't know what to do." He waited around for his money for washing the blinds the day before. Appellant paid W.P. for the blinds and then gave him some extra money "for

---

[5] W.P. and his father both testified that W.P. had a traumatic time dealing with his older brother's suicide in 2004. W.P. had found his brother, who had hung himself outside their home.

what he had done and that [W.P.] should not tell James or anyone." But that very afternoon W.P. did tell James. James made W.P. feel bad because he "was talking down on me like that I was gay and like I was wrong and I shouldn't have done it." W.P. was hurt by James's reaction, so he did not tell anyone else about what had happened.

About three or four weeks later, appellant started calling and asking if W.P. could come over and let appellant watch him masturbate. At first, W.P. did not want to see appellant, but he later called and asked to borrow some money. Appellant said that if W.P. "came over there and let him watch [W.P.] masturbate that he would pay [him] some money and [he] wouldn't have to borrow it." W.P. figured that this was "easy money," so he went over to appellant's apartment. Appellant gave him oral sex, then paid him $100. This happened again one or two more times. The last time it happened–in March or April–appellant said that he would pay W.P. $200, but he only gave him $100.

On April 6th, W.P. told William, a lifelong family friend, what he and appellant had done and how appellant owed him money. At first, William didn't believe W.P., but when he did, he was "shocked" and angry: "Oh, man, it tore me up," but W.P. told him to "keep his cool whenever he came over" to appellant's apartment.

W.P. spent the night of April 6th at appellant's house, along with William, another friend, Marcus, and Jason Dennis, a friend of Marcus's. They were all drinking and smoking marijuana.[6] The four boys left around noon and walked back to W.P.'s house because he was

---

[6] Marcus said that he met appellant on April 6th when appellant peered out of his apartment window at him and a group of boys who were being "smart alecs" and waving at

supposed to work for his father that day.  After Marcus and his friend left, W.P. and William decided to go back to appellant's apartment to get the $100 that appellant owed him.  They told W.P.'s father that appellant owed W.P. money and they were going to go get it.  When the two boys did not immediately return, W.P.'s father drove over to appellant's apartment to collect them.  Appellant opened the door and told Bobby that W.P. was not there.  Bobby then drove back home, and about ten minutes later W.P. and William returned.  W.P. seemed "perplexed," and both boys were "agitated."  W.P. said that he wanted his money from appellant, so Bobby said that he would drive him over to appellant's apartment to "check on" the money, and then they would go to work.

William, however, had already started back to appellant's apartment to get W.P.'s money.  He was angry at appellant.  W.P. told his mother that William was going to "jack" appellant for some money.[7]  W.P.'s mother told Bobby that William was angry and going to appellant's to collect W.P.'s money, so all three of them drove toward appellant's apartment and found William along the way.  William got into the truck with them.  Bobby stopped at appellant's apartment complex, saw him in the parking lot, and asked him if he would have W.P.'s money later that day.  Appellant said that "more than likely he would," so Bobby said

---

appellant.  Appellant came out and asked the boys if they drank beer.  They sat in appellant's apartment smoking marijuana, and some of the boys drank beer.  He left the next morning with W.P. and William, but then returned and was present when the police came to arrest appellant.

[7] W.P. denied that either he or William were planning to rob appellant; he said that William was going to "jack with" appellant–meaning harass him–to get W.P.'s money.  William testified that he wanted to go to appellant's apartment alone because "he owed my friend money" and was "jacking around with my best friend."

that they would come back later.

Meanwhile, W.P. whispered to his mother, telling her what he and appellant had been doing. As Bobby drove down the street, W.P.'s mother told him that she and W.P. had something to tell him. Bobby pulled into a washateria parking lot, and W.P. told his father exactly why appellant owed him the $100 and why William was angry and ready to "jack" appellant. Bobby called 911 on his cell phone, but the dispatcher told him to come to the police station to make a statement.

Officer Burke, a patrol officer, happened to be driving by the washateria, and he stopped because he saw the family arguing.[8] They were relieved to see him and said that the reason they were upset was because W.P.'s father had just found out that his son had been receiving oral sex from an adult man. W.P. told him that some videotapes in Jason Dennis's car might contain footage of the "sex acts."[9] Officer Burke radioed other officers to go to appellant's apartment[10] while he escorted W.P. and his family to the police station. They met with Debbie Rule, a 20-year veteran with the Balch Springs Police Department, who investigated crimes against children. They all gave written statements.

Finally, the State called Dr. Ellen J. Elliston, a psychologist, who testified that teen-

---

[8] Officer Burke was called by the defense.

[9] Two videotapes were obtained from Dennis's car, but Officer Burke did not know what they showed.

[10] The responding officers found appellant, Marcus, and Jason Dennis at appellant's apartment. They arrested appellant, obtained the videotapes from Jason Dennis, and took all three men to the police station.

agers who experience instability in their lives, such as the death of a family member, may be "more vulnerable to victimization." She also stated that teen-age boys are reluctant to report sexual abuse and usually do not tell their parents about it. Further, their traumatization may affect their ability to provide details or tell a coherent version of events.

Appellant called Cheryl Anderson, a TXU Energy employee, who testified that she had been requested to search the TXU electricity records for appellant's apartment address between December 1, 2004, and April 7, 2005. Ms. Anderson found no TXU service records for that apartment during that time frame. She did not know whether electricity had been stopped at that apartment or if it had ever been restored. She did not know whether TXU had records for electricity to any of the other apartments in that complex or whether other electricity companies provided service.

Appellant also presented an alibi defense for January 8, 2005, from his aunt and uncle. They both testified that they met with appellant at the uncle's house that evening at about 8:30 p.m. to decide whether to loan him $500 to pay his apartment rent. Appellant's aunt wrote him a check on that day for his rent, with the notation "Rent, Chris Irby, F1, December 23 through January 31." She lent him the rent money because appellant was going to go to work for his uncle's company and the repayment would be subtracted from his paycheck.

Phil Blackstone testified that he owned the "four-plex" building in the apartment complex where appellant lived. Appellant gave him the $500 rent check from appellant's aunt, and he deposited it on January 13, 2005. Because appellant did not pay the February

or March rent, Mr. Blackstone had him evicted on April 14th.

Final arguments by both the prosecution and defense centered on whether W.P. fabricated the entire story of a sexual relationship with appellant. The prosecutor argued that W.P. had no motive to fabricate such a self-damaging sex-for-money story.[11] The defense argued that W.P. and his friends were liars who had conspired to rob appellant and, when that

---

[11] The prosecutor argued,

> And how do we know that [W.P.] is telling the truth, we, as reasonable people? We know because no 16-year-old boy ever is going to make up that story. Do 16-year-olds lie? Absolutely. Do they lie about accepting money for sexual favors for no reason? What is the motive?
> You heard the defense attorney talk in his opening statement and the promises he made you about some conspiracy to commit a robbery. There is no evidence that there was a conspiracy to commit a robbery. William was going to go over and take the money that was owed to [W.P.] I'll give you that. Did the defendant know anything about that? No. Marcus says, we're all sitting around, everything is cool, everybody is hanging out, no problems, no arguments, no problems, no conflicts. Until the police arrive, everything is fine.
> They weren't about to get caught. Were the police investigating [W.P.] and William for anything? No. So why is it then that this 16-year-old with nothing to gain would say to his father and his mother and police officers and for two years to continue to say it until he has to come into a courtroom and say it in front of 12 strangers, I allowed the defendant, a grown man, to pay me money and perform oral sex on me?
> Is that the story he's going to make up? If there is some motive to get Christopher Irby, is that the story he's going to say? Or is he going to say, I was forced. Is he going to say he had a gun. He had a knife. I saw him do all sorts of things to everybody.
> That's not what he says.
> I accepted money.
> And he has absolutely no reason to come in here and lie to you. Use your common sense.

In addressing the issue of the boys being unreliable witnesses because they drank and smoked marijuana with appellant, the prosecutor stated, "He provided it. He took advantage of vulnerable kids in vulnerable situations, and he comes into this courtroom and calls them liars. Isn't that easy? Isn't that easy? What a better victim to choose."

fell through, made up a tale of sexual exploitation. Defense counsel pointed to numerous inconsistencies and contradictions in the witnesses' testimony and listed seven specific "lies."[12] He summed up the defense position as follows:

> Ladies and gentlemen, you've been lied to repeatedly . . . . And the problem with the testimony that you've heard from [W.P.] and all of those lies is that in that same breath he told you he got sexually assaulted and none of you saw any change in his demeanor between when he was lying and we know he was lying and when he said he was sexually assaulted. He didn't start to stutter, give you any clue that he was lying. It flowed from him like water. The lies came right along with the allegation of sexual assault.
> . . .
> Motive. I told you in opening I can't tell you what the motive is. I think you heard from some bad people. I think William Flowers is a bad person. I think when you're 19 and you have decided to tattoo your neck and hands, you've made a statement to the world–

The defense then compared the inconsistencies of the State's witnesses with the consistency of appellant's alibi witnesses:

> And I don't think you should have any doubts about the credibility of our witnesses, because unlike the State's witnesses, when you are telling the truth it is easy to tell a coherent consistent story.

In rebuttal, the State admitted to various inconsistencies by W.P. and his friends and family: "There are going to be some differences. Does that mean they're lying? Does that mean that there is some conspiracy against this defendant brought on by [W.P.] and his

---

[12] These included the defense counsel's statements that (1) W.P. said that he did tell his friend James about the first sexual encounter and then said he did not; (2) W.P. said that he and William did spend the night of April 6th at appellant's apartment and others suggested that they did not do so; (3) Marcus said that he did not see William or W.P. at appellant's apartment on April 6th and other witnesses suggested that he did; (4) W.P.'s testimony that he told his mother first about the sexual encounters and Officer Burke testified that someone told him that W.P. had told his father first.

friends? No." The prosecutor reminded the jury of the psychologist's testimony concerning

emotional problems brought on by high stress events and of how W.P. had been affected by

finding his big brother after he had committed suicide.

The jury convicted appellant and, because he had a prior sex-offense conviction, the

trial judge was required to sentence him to life in prison.

## B.     Proceedings in the Court of Appeals.

On appeal, appellant complained that the trial judge denied him his constitutional right

to confrontation and cross-examination by not permitting defense counsel to cross-examine

W.P. about his juvenile deferred-adjudication probation.[13]  The court of appeals upheld the

trial judge's ruling.  It first noted that "evidence of a juvenile adjudication, outside the realm

of a juvenile proceeding, is not admissible for impeachment unless required by the Texas or

United States Constitutions."[14]  It then acknowledged that the confrontation clause may

require the admission of such evidence "if the cross-examination is reasonably calculated to

expose a motive, bias, or interest for the witness to testify."[15]  But the mere fact that a

---

[13] Appellant did not make an offer of proof by questioning W.P.  The only evidence of W.P.'s juvenile record is contained in the "State's Response to Defense's Motion for Criminal History of State's Witnesses."  The pertinent entry reads: "Aggravated Assault/Deadly Weapon, January 30, 2005, juvenile offense transferred to adult probation– F0699715."  Defense counsel questioned W.P.'s father about this matter outside the presence of the jury, but Bobby knew very little about it except that W.P. had been given one to two years of probation and was still on probation at the time of trial.

[14] *Irby*, 2008 Tex. App. LEXIS 4544, at *18.

[15] *Id.* (citing *Davis*, 415 U.S. at 317-18; *Hoyos v. State*, 982 S.W.2d 419, 421 (Tex. Crim. App. 1998); *Carroll v. State*, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996)).

juvenile had been placed on probation or had some other "vulnerable relationship" with the State is not enough to establish bias or prejudice; the cross-examiner must show some "causal connection" between the witness's "vulnerable relationship" and the witness's testimony.[16] The court of appeals concluded that appellant had failed to show any such connection between W.P.'s juvenile record and his testimony at trial, thus the trial judge did not abuse his discretion in forbidding such cross-examination.[17]

On discretionary review in this Court, appellant argues that the court of appeals incorrectly held that *Davis v. Alaska* mandates a "causal connection" between the witness's "vulnerable relationship" with the State and the potential bias or prejudice of that witness. He also asserts that our decision in *Carpenter v. State*,[18] which had held that the proponent of the evidence of a pending charge must establish "some causal connection or logical relationship" between the pending charges and the witness's potential bias before it is admissible,[19] was "wrongly decided."[20]

---

[16] *Id.* at *19.

[17] *Id.* at *20 (noting that the defense had failed to show that (1) any motion to revoke probation was pending, either at the time W.P. made the allegations against appellant or at the time of testifying; or (2) W.P. had some bias to testify favorably for the State because of his juvenile deferred-adjudication status).

[18] 979 S.W.2d 633 (Tex. Crim. App. 1998).

[19] *Id.* at 634-35.

[20] Appellant's Brief at 23 & 27.

II.

The constitutional right of confrontation includes the right to cross-examine the witnesses and the opportunity to show that a witness is biased or that his testimony is exaggerated or unbelievable.[21]  Nonetheless, the trial judge retains wide latitude to impose reasonable limits on such cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."[22]  The constitutional right to cross-examine concerning the witness's potential bias or prejudice does not include "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."[23]

Appellant relies upon *Davis v. Alaska* and its Texas progeny for the proposition that any witness, including a juvenile, who is on probation may be cross-examined about that status to show a potential bias or motive to testify for the State.[24]  Appellant reads these cases

---

[21] *Pennsylvania v. Ritchie*, 480 U.S. 39, 51-52 (1987); *see United States v. Abel*, 469 U.S. 45, 50 (1984) (evidence that both defendant and defense witness belonged to same prison gang, whose tenets required its members to lie, cheat, steal, and kill to protect each other was admissible because it was probative of defense witness's possible bias toward a bank-robbery defendant); *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79 (1986) (error to prohibit any cross-examination of State's witness concerning possibility that he might be biased in favor of State because of dismissal of his pending public-drunkenness charge).

[22] *Van Arsdall*, 475 U.S. at 679.

[23] *Id.* (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20 (1985) (*per curiam*)).

[24] Appellant's Brief at 21 ("This Court has clearly held, under *Davis v. Alaska*, that a defendant is permitted to cross-examine a State's witness on the status of his deferred adjudication probation in order to show a potential motive, bias, or interest to testify for the State.").

too broadly.

In *Davis*, the evidence showed that someone burglarized the Polar Bar and stole its safe, which contained over a thousand dollars in cash.[25] The same day, police received a tip that a safe had been discovered 26 miles outside Anchorage near the home of Jess Straight. When questioned by the police at the scene, Mr. Straight's stepson, Richard Green, told them that he had seen and spoken with "two Negro men standing alongside a late-model metallic blue Chevrolet sedan near where the safe was later discovered."[26] Serendipitously, Richard Green was on juvenile probation for burglarizing two cabins.[27] He identified the defendant as one of the two men he had met in a photographic show-up the next day and, after the defendant's arrest, identified him in a live line-up.[28]

At trial, the defendant argued that, although juvenile records were confidential under Alaska law, he should have been allowed to cross-examine Richard about his probation because Richard might (1) have felt that he was a suspect himself; and (2) have been subjected to undue pressure from police, fearing possible probation revocation.[29] The trial

---

[25] *Davis*, 415 U.S. at 309.

[26] *Id.*

[27] *Id.* at 311.

[28] *Id.* at 310.

[29] *Id.* at 317-18 ("The claim of bias which the defense sought to develop was admissible to afford a basis for an inference of undue pressure because of Green's vulnerable status as a probationer, as well as of Green's possible concern that he might be a suspect in the investigation.") (internal citation omitted).

judge refused to allow the cross-examination, but the Supreme Court held that, "[o]n these facts," the defendant's constitutional right to cross-examine the witnesses against him for bias and motive was violated. The Supreme Court carefully distinguished between the "introduction of evidence of a prior crime [as] a general attack on the credibility of the witness" and "[a] more particular attack on the witness' credibility . . . . by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand."[30] That is, Richard may have felt that the police would suspect him of the burglary both because he had a prior burglary adjudication and because the emptied safe was found on his family's property. Based upon these particular facts, Richard had a possible motive to divert suspicion from himself to another. Further, the police might also have brought undue pressure upon Richard to make an identification of someone–anyone–because he was in "a vulnerable relationship" by virtue of being on probation for burglary, a fact that the investigating officers may also have known and used in questioning him. Richard's possible motives were directly related and connected "to issues or personalities in the case at hand."

The Supreme Court found that the state's policy interest in protecting the confidentiality of a juvenile offender's record could not require the defendant to yield his right to cross-examine a witness for a particular bias.[31] But the Court carefully tailored its

[30] *Id.* at 316.

[31] *See id.* at 319.

decision to the very specific facts before it.[32]   As Justice Stewart emphasized in his concurring opinion, *Davis* neither "holds nor suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination about his [or her] past delinquency adjudications or criminal convictions."[33]   And, as we recently held in *Hammer v. State*, neither *Davis* nor the Confrontation Clause require that courts permit the use of prior juvenile acts of misconduct or adjudications for general impeachment of credibility.[34]

In Texas, as in most jurisdictions, juvenile criminal records and adjudications are not admissible to impeach the general credibility of a testifying witness, even though the juvenile may be on probation and is technically in a "vulnerable relationship" with the State throughout that probationary period.  Rule 609(d) of the Texas Rules of Evidence explicitly prohibits their use for attacking the general credibility of the witness.[35]  But Rule 609(d) also

---

[32] *See Carmona v. State*, 698 S.W.2d 100, 104 (Tex. Crim. App. 1985) (stating that the *Davis* decision "is limited by its facts. The opinion in *Davis* is replete with references to 'on the facts of this case,' 'in this setting,' and other such references which indicate that Joshaway Davis was denied the right of *effective cross-examination*.") (emphasis in original).

[33] *Davis*, 415 U.S. at 321 (Stewart, J., concurring).

[34] *Hammer v. State*, 296 S.W.3d 555, 562 (Tex. Crim. App. 2009) ("[T]he *Davis* Court did not hold that a defendant has an absolute constitutional right to impeach the general credibility of a witness in any fashion that he chooses.  But the constitution is offended if the state evidentiary rule would prohibit him from cross-examining a witness concerning possible motives, bias, and prejudice to such an extent that he could not present a vital defensive theory.").

[35] TEX. R. EVID. 609(d) ("Juvenile Adjudications.  Evidence of juvenile adjudications is not admissible, except for proceedings conducted pursuant to Title III, Family Code, in which the witness is a party, under this rule unless required to be admitted by the Constitution of the United

contains an explicit exception that such evidence may be admissible when it is required by

the United States Constitution,[36] such as in the *Davis* scenario.

In *Carpenter v. State*,[37] this Court held that, in the context of cross-examination of a

witness with pending charges, "[f]or the evidence to be admissible, the proponent must

establish some causal connection or logical relationship between the pending charges and the

witness' 'vulnerable relationship' or potential bias or prejudice for the State, or testimony at

trial."[38]   That is, a "vulnerable relationship" based on a witness's pending charges or

probationary status does not hover cloud-like in the air, ready to rain down as impeachment

evidence upon any and all such witnesses.  There must be some logical connection between

---

States or Texas."); *see also* TEX. FAM. CODE § 51.13(b); *see Gilmore v. State*, 871 S.W.2d 848, 850-51 (Tex. App.—Houston [14th Dist.] 1994, no pet.) (excluding cross-examination by defendant of complaining witness about witness's prior juvenile record was not error); *see also United States v. Decker*, 543 F.2d 1102, 1105 (5th Cir. 1976) (distinguishing *Davis* as a case involving bias and not one allowing a constitutional right to impeach a witness's general credibility with juvenile adjudications); *see generally*, Daniel E. Feld, Annotation, *Use of Judgment in Prior Juvenile Court Proceeding to Impeach Credibility of Witness*, 63 A.L.R.3d 1112, § 3 (collecting cases setting out the general rule that a juvenile court adjudication may not be used to impeach the credibility of a witness).

[36] TEX. R. EVID. 609(d).

[37] 979 S.W.2d 633 (Tex. Crim. App. 1998).

[38] *Id.* at 634-35 & n.4 (Tex. Crim. App. 1998) (not error to exclude impeachment of witness with pending federal charges; "Naked allegations which do no more than establish the fact that unrelated federal charges are pending do not, in and of themselves, show a potential for bias"; stating that the defendant failed to demonstrate why prosecution by the federal government for theft and conspiracy would tend to show that the witness's testimony in this unrelated state prosecution for tampering with government documents might be biased); *see also id.* at 636 (Price, J., concurring) ("there is nothing in the record which would establish how the [witness's] pending federal charges were relevant to his testimony at appellant's trial" and "nothing in the record to show that he was aware of the [federal] sentencing guidelines or that he had any type of 'deal' with the federal prosecutors in charge of his case.").

that "vulnerable relationship" and the witness's potential motive for testifying as he does.[39]

---

[39] Numerous other state cases have held that when there is a logical connection between the juvenile witness's prior convictions or juvenile probation status and the factual basis for a potential bias, the defendant is entitled, under *Davis*, to impeach that witness with that status or those convictions under the Sixth Amendment. *See, e.g., Wood v. State*, 837 P.2d 743, 747 (Alaska Ct. App. 1992) (at time police interrogated juvenile about defendant's purported sexual molestation, juvenile was on a form of deferred prosecution for an unrelated incident in which the juvenile was accused of sexual molestation of another minor; defendant was entitled to cross-examine juvenile concerning that charge because the victim might have been motivated to fabricate the charges of abuse against defendant to "curry favor" with the interrogating officer who might use any lack of cooperation as a basis to terminate the deferred-prosecution agreement); *People v. Bowman*, 669 P.2d 1369, 1374 (Colo. 1983) (in arson/murder prosecution, defendant was entitled to cross-examine stepson about his pending juvenile probation status and pending robbery charges to show that he was "resentful toward his parents for placing restrictions on him due to his trouble with the law" and that he might therefore have had a motive to start the fatal fire himself); *Gillespie v. United States*, 368 A.2d 1136, 1136-37 (D.C. 1977) (defendant was entitled to cross-examine one of three juvenile witnesses against him about his robbery probation status as all three witnesses against defendant were related and had a motive to shift possible blame from themselves to defendant and to protect their relative from probation revocation if they were accused as defendant's accomplices); *People v. Triplett*, 485 N.E.2d 9, 15 (Ill. 1985) (defendant entitled to cross-examine juvenile about his in-custody status at the time of trial and about his prior "contacts" with police to show that he had a motive to cooperate with police at time he was interrogated about incident; "It was only after the police had threatened him with jail that he told police that [defendant] had shot the victim."); *State v. Russell*, 625 S.W.2d 138, 139-40 (Mont. 1981) (defendant was properly permitted to impeach juvenile, who was defendant's co-defendant in robbery, with fact that he had pled guilty to the robbery, was sent to a juvenile facility for his role in that offense, and had been released on probation the day before trial; trial court did not err in otherwise limiting cross-examination of juvenile's other crimes and stating that *Davis* "permits proof of the bias which could result from the juvenile witness's motive to lie because he is a suspect and subject to control of the juvenile authorities. It does not hold that a state court must permit the general credibility of a juvenile to be attacked by a record of juvenile adjudication or unrestrained cross-examination concerning such adjudication or acts of misconduct."); *Livingston v. State*, 907 P.2d 1088, 1092 (Okla. Crim. App. 1995) (trial court improperly limited defendant's cross-examination of his son regarding potential bias based on the fact that defendant had testified against his son in a prior juvenile proceeding); *State v. Sparkman*, 339 So.2d 865, 867 (S.C. 1986) (defendant was entitled to cross-examine juvenile witness–defendant's accomplice–concerning juvenile's plea to housebreaking and arson charges which included an agreement to testify against defendant); *Hannon v. State*, 84 P.3d 320, 332 (Wyo. 2004) (defendant in sexual-assault prosecution was entitled to cross-examine juvenile victim about the fact that he did not report the alleged assault until three months after event–when he was brought in for questioning about his own alleged sexual molestation of another boy; prohibited cross-examination was sufficiently probative of a possible ulterior motive for alleged

As Judge Meyers explained in *Carpenter*, this "causal connection" or logical relationship is a matter of simple relevance under Rule 401.[40] Evidence that a witness is on probation, is facing pending charges, or has a prior juvenile record is not relevant for purposes of showing bias or a motive to testify absent some plausible connection between that fact and the witness's testimony. *Carpenter* is a prime example of when and why a logical connection is necessary. A long line of cases hold that a witness may be cross-examined for bias concerning a pending charge because his testimony may be "given under a promise or expectation of immunity, or under the coercive effect of his detention by officers . . . conducting the present prosecution."[41] But, in *Carpenter*, we did not follow that general rule because the pending charges were in federal court and the witness was testifying in state court. Thus, absent additional facts of some potential "deal" between state and federal

victim's accusations against defendant; "Had defense counsel been allowed to explore this issue with TB during cross-examination, the jury reasonably might have inferred TB was fearful about what would happen to him as a result of his own acts and concocted the allegations against [defendant] to shift the focus of the police inquiry away from him.").

[40] *Carpenter*, 979 S.W.2d at 634 ("In order to impeach a witness with evidence of pending criminal actions, the proponent of the evidence must establish that the evidence is relevant."); *see also Arroyo v. State*, 259 S.W.3d 831, 835-36 (Tex. App.—Tyler 2008, no pet.) (following *Carpenter* and holding that defendant was properly precluded from cross-examining eyewitness about her immigration or citizenship status as a "vulnerable relationship" to show bias and motive to testify for the State because no showing of a logical connection between that status and her testimony).

[41] *Alford v. United States*, 282 U.S. 687, 693 (1931); *see also Carroll v. State*, 916 S.W.2d 494, 500-01 (Tex. Crim. App. 1996) (defendant was entitled to cross-examine witness about his current incarceration, his pending charge, and possible punishment as habitual criminal to show his potential motive, bias, or interest to testify for the State, even absent any proof that the State had made promises to him in return for his testimony because witness may have believed his testimony would be of benefit).

authorities, there was no logical connection between the federal pending charges and the witness's possible motive to "curry favor" with state authorities. The pending federal charge was therefore irrelevant as a possible source of bias.[42] The reasoning and result in *Carpenter* is in accord with numerous Texas cases in which the cross-examiner failed to show a logical connection between the fact or condition that *could* give rise to a potential bias or motive and the existence of any bias or motive to testify.[43]

---

[42] *See, e.g., Carroll*, 916 S.W.2d at 505 (Keller, J., dissenting) ("I agree that, ordinarily, the mere existence of a pending charge gives rise to an inference that the witness may have been influenced. But in some cases, additional facts in the record may show that such an inference is not warranted. If the latter is the case, and the defendant fails to otherwise make some showing that the pending charge may have influenced the witness, then the trial court does not abuse its discretion in disallowing cross-examination on that subject."). As then–Judge Keller explained,

> In this case, Russell [the witness] was charged with aggravated robbery *after* he gave the police his statement regarding the offense with which appellant was charged. Russell's earlier statement was entirely consistent with his testimony at appellant's trial. One cannot infer from the mere existence of the pending charge that it may have influenced Russell's testimony because any motive for helping the State arose after Russell reported his version of the events. Appellant has not otherwise shown that the pending charge may have influenced Russell's testimony at trial.

*Id.* (emphasis in original). Judge Keller's dissent in *Carroll* laid the groundwork for the Court's reasoning in *Carpenter.*

[43] *See, e.g., Woods v. State,* 152 S.W.3d 105, 111-12 (Tex. Crim. App. 2004) (trial court properly refused to allow defense to ask witness about possibility of receiving parole or good time; witness was not eligible for good time and there was no indication that he expected to be rewarded for testimony favorable to prosecution); *Willingham v. State*, 897 S.W.2d 351, 358 (Tex. Crim. App. 1995) (defendant failed to show any "specific connection" between witness's alleged hope for early release from prison and his motive to testify); *Ex parte Kimes*, 872 S.W.2d 700, 703 (Tex. Crim. App. 1993) (when witness did not know he was a suspect in two crimes, evidence of his "suspect" status had "no legitimate tendency to show that [he] was biased in favor of the State."); *Janecka v. State*, 739 S.W.2d 813, 830-31 (Tex. Crim. App. 1987) (limitation of impeachment proper where defendant attempted to show witness's spouse had entered into plea bargain with State but failed to show why this would influence witness's testimony); *London v. State*, 739 S.W.2d 842, 846-47 (Tex. Crim. App. 1987) (State failed to show a causal connection between the fact that a defense witness's relative had "troubles with the

Appellant relies on this Court's opinion in *Maxwell v. State*[44] for the proposition that

_____

law" and any actual bias or motive to testify on behalf of defendant); *Callins v. State*, 780 S.W.2d 176, 196 (Tex. Crim. App. 1989) (op. on reh'g) (trial court did not err in prohibiting cross-examination of witness concerning his status on deferred adjudication when defendant failed to show that the witness was biased against him because of that status); *Adams v. State*, 577 S.W.2d 717, 720-21 (Tex. Crim. App. 1979) ("evidence of pending charges against a witness is admissible under certain circumstances for the limited purpose of showing bias, prejudice, interest, and motive of the witness in testifying as he did"; trial court did not err in excluding cross-examination of State's witness concerning his extraneous offenses when defense made no attempt to show that witness's testimony had been prompted by the promise or hope of favorable treatment), *rev'd in part on other grounds,* 448 U.S. 38 (1980); *Garza v. State*, 532 S.W.2d 624, 626 (Tex. Crim. App. 1976) (distinguishing *Davis v. Alaska* and stating that witness's arrest record and pending case was not admissible to establish his bias or motive because "there was no attempt made to show that the pending indictment was being used to force the witness' testimony or that he expected more favorable treatment in his pending case because of his testimony in this case."); *Smith v. State*, 236 S.W.3d 282, 292-94 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (trial court did not err in refusing to allow defendant to question complaining witness about her deferred-adjudication probation; witness had given description of defendant to police before she was arrested, was not trying to shift suspicion away from herself, did not identify defendant at trial, and did not provide crucial testimony for prosecution); *Crenshaw v. State*, 125 S.W.3d 651, 654-55 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (trial court properly disallowed defendant from asking witnesses on cross-examination about whether they had committed an aggravated robbery because there was no showing that police suspected witnesses of committing such crime); *Juneau v. State*, 49 S.W.3d 387, 389-90 (Tex. App.—Fort Worth 2000, no pet.) (defendant failed to show logical connection between witness's deferred adjudication status and any potential bias or motive); *Moreno v. State*, 944 S.W.2d 685, 690-92 (Tex. App.—Houston [14th Dist.] 1997) (State failed to show any logical connection between defendant's deferred-adjudication status and his bias or motive to testify on his own behalf; "There was nothing in the record indicating any pressure on appellant by the state to revoke his deferred adjudication if he was convicted of the DWI. There was nothing in the record that would indicate that appellant's testimony was 'slanted' because of any bias, motive or ill will directed at the state emanating from his status on deferred adjudication. There is no evidence that appellant's deferred adjudication status in and of itself created bias or interest on his part sufficient to falsify his testimony."), *aff'd*, 22 S.W.3d 482 (Tex. Crim. App. 1999); *Duncan v. State*, 899 S.W.2d 279, 281 (Tex. App.—Houston [14th Dist.] 1995, pet. ref'd) ("To invoke his right to question a witness about deferred adjudication a defendant must show the witness testified against him as a result of bias, motive or ill will emanating from the witness' status of deferred adjudication"; fact that witness was on deferred adjudication for unrelated crime did not show bias); *Saenz v. State*, 840 S.W.2d 96, 100 (Tex. App.—El Paso 1992, pet. ref'd) (trial court did not err in prohibiting defense from cross-examining 14-year-old witness about prior run-ins with juvenile authorities; witness had never been arrested, was unaware of any charges pending against him, and record was devoid of showing of motive to testify favorably to State).

the mere fact of probation status is always and inevitably sufficient to establish a witness's potential bias and motive to "curry favor" with the authorities. Indeed, *Maxwell* could be read that broadly, but that would be inconsistent with *Carpenter* and our other Texas cases which require some logical relevance of the pending charge, probation or immigration status, or other alleged source of bias to the witness's testimony.[45] In *Maxwell*, the Court relied upon two earlier Texas cases, in which the cross-examiner had, in fact, shown a logical relationship between the witness's pending charge, probation, or other alleged source of bias and his testimony.[46] We said that Texas and Supreme Court cases "have indicated that a

---

[44] 48 S.W.3d 196 (Tex. Crim. App. 2001).

[45] *Maxwell* explicitly relied on *Moreno v. State*, 22 S.W.3d 482, 486 (Tex. Crim. App. 1999), which stated that "evidence that involves unadjudicated crimes *could* be admissible to show a witness's bias or interest[.]" (emphasis added). Indeed, all of these base facts–probationary status, pending charges, unadjudicated crimes or other bad acts–may be admissible to show motive or bias if the proponent makes a logical connection between the base fact and the witness's testimony. Otherwise, it is irrelevant. *See* cases collected in note 43.

[46] *See Maxwell*, 48 S.W.3d at 198-99 (citing *Moreno*, 22 S.W.3d at 485-86, and relying on *Evans v. State*, 519 S.W.2d 868, 871-73 (Tex. Crim. App. 1975), and *Carroll v. State,* 916 S.W.2d 494, 500 (Tex. Crim. App. 1996)). In *Moreno*, this Court held that the State could *not* cross-examine the defendant with his deferred adjudication probation status to show his potential bias and motive for testifying because it had "vanishingly" low probative value and was highly prejudicial. 22 S.W.3d at 489. It was prohibited under Rule 403. *See* TEX. R. EVID. 403. In *Evans*, this Court held that the trial court erred in preventing cross-examination of the State's witness, who had a pending sodomy charge in the very same court in which the defendant's case was being tried and that the trial setting on that sodomy charge kept being postponed until after the defendant's trial. 519 S.W.2d at 871. Furthermore, the State's witness was questioned by the police as an alternate suspect for the murder that the defendant was ultimately charged with. He clearly had a motive to shift suspicion away from himself and toward the defendant. *Id.* at 873. Finally, in *Carroll*, the witness against the defendant was in jail on pending aggravated robbery charges, and those charges could be enhanced by prior convictions to habitual offender status. 916 S.W.2d at 500. Thus, the State clearly had considerable power and control over that witness's fate. *Id.* Even though there was no agreement between the State and the witness concerning the disposition of those charges, the witness himself might well have "believed his

witness's deferred adjudication probation status is sufficient to show a bias or interest in helping the State."[47]  Some of our cases might, at first blush, have "indicated" such a possibly broad brush, but they all use qualifiers such as "may be"[48] or "under certain circumstances,"[49] or "under these facts."[50]  And the cross-examiner must still show the relevance of the "vulnerable status" or other alleged source of bias to the witness's testimony.  It is not enough to say that all witnesses who may, coincidentally, be on probation, have pending charges, be in the country illegally, or have some other "vulnerable status" are automatically subject to cross-examination with that status regardless of its lack of relevance to the testimony of that witness.  Thus, to the extent that *Maxwell* is inconsistent with *Carpenter*, we overrule it.[51]

---

testimony in this case would be of later benefit." *Id.*  Yes, indeed.  The logical, rational, and reasonable connection between the witness's own notion (even without any suggestion by the prosecution) of the State's ability to punish or reward him for his testimony is obvious–he can hope for dismissal of the pending charges and dread a life sentence if the charges are not dismissed, depending upon his value as a witness for the State.

[47] *Maxwell*, 48 S.W.3d at 200.

[48] *Moreno*, 22 S.W.3d at 486.

[49] *Adams*, 577 S.W.2d at 721; *Evans*, 519 S.W.2d at 872-73.

[50] *Davis v. Alaska*, 415 U.S. at 318; *see also id*. at 321 (Stewart, J., concurring) ("in the circumstances of this case").

[51] Commentators have expressed concern about the confusion generated by *Maxwell*.  As noted in The Texas Rules of Evidence Manual,

> The decision of the Court of Criminal Appeals in *Maxwell v. State*, creates uncertainty with reference to the relevancy requirement of prior cases in showing bias and interest.  At one point in the majority opinion, the Court stated categorically that, "[A] defendant is permitted to cross-examine a State's witness on the status of his deferred adjudication probation in order to show a *potential*

Furthermore, Texas, like other states, has an important interest in "protecting the anonymity of juvenile offenders[.]"[52] Our Family Code and Rules of Evidence explicitly protect that anonymity.[53] To hold that any juvenile who happens to be on probation at the time that he also is the victim of a crime or a witness in a criminal proceeding automatically loses that privacy protection is not required by the constitution or by common sense.

In sum, *Davis v. Alaska* is not a blunderbuss that decimates all other evidentiary statutes, rules, and relevance requirements in matters of witness impeachment. It is a rapier that targets only a specific mode of impeachment–bias and motive–when the cross-examiner can show a logical connection between the evidence suggesting bias or motive and the

---

motive, bias or interest to testify for the State . . . ." Later, the majority observed that, prior to testifying, the witness had committed an offense that caused his deferred adjudication to be subject to adjudication at the time he testified, and stated, "*Therefore*, we conclude that the jury was entitled to hear evidence of [the witness's] deferred adjudication to decide the amount of weight and credibility to give to his testimony."

It is unclear whether the fact of the offense that subjected the witness to potential adjudication entitled the defendant to show the witness's vulnerable relationship to the State, or whether the witness's mere status of being on deferred adjudication entitled the defendant to cross-examine him about that status.

DAVID A. SCHLUTER & ROBERT R. BARTON, TEXAS RULES OF EVIDENCE MANUAL § 613.02[3][f] at 613-14 (8th ed. 2009). As the authors aptly noted, there is a distinct difference between the mere status of deferred adjudication probation and the prospect of having that probation adjudicated because of an intervening crime–the factual situation in *Maxwell*. *Id.* at 614. Thus, the facts in *Maxwell* show that the witness did, in fact, testify under the implicit coercion of having his probation revoked. By the time of trial, he had been convicted of a misdemeanor that could be used to immediately revoke his felony probation should the State so choose. Even without evidence of any special "deal," promises, or coercion, the witness may have felt that he would ultimately benefit by testifying favorably for the State. *Maxwell*, 48 S.W.3d at 200.

[52] *Davis*, 415 U.S. at 319.

[53] TEX. R. EVID. 609(d); TEX. FAM. CODE § 51.13(b).

witness's testimony. We therefore reject appellant's absolutist position that "[a] probationer, particularly a probationer whose guilt has not yet been adjudicated, is always in a vulnerable relationship with the State" and that mere status is always automatically relevant to show a witness's possible bias and motive to testify favorably for the State as inconsistent with Texas and United States Supreme Court precedent.

III.

Appellant also argues, as he did in the trial court, that he had shown a logical connection between W.P.'s probation status and his testimony. We therefore turn to that issue. At trial, it was appellant's position that W.P. made up the story of sexual assault: It was a false allegation. Obviously, then, any evidence showing that W.P. had a motive to make up this story is relevant and admissible for impeachment purposes. The timing of this purportedly false allegation was crucial. If W.P. had a motive to make up the accusatory story, he had that motive at the time that he first told others about it.

When did he purportedly "make it up," and whom did he tell? W.P. said that the first sexual encounter occurred on or about January 10, 2005, and that there were several more encounters in March and early April. The first person W.P. told was his friend James, the day after the first encounter. But James made W.P. feel bad about himself, so he did not tell anyone else for two months. The second person he told was his friend William on April 6th. The two boys were in a parking lot "just chillin'" at the time. According to W.P., William did not believe him at first, but when he did, it came as a "shock." William testified that he

believed W.P. "100 percent" because he would have "no reason to conjure up something like that." The third person to whom W.P. related the story was his mother. He told her on April 7th, right after she, W.P., and his father had intercepted William on his way to demand $100 from appellant–the unpaid half of the $200 appellant had purportedly promised W.P. for their most recent sexual encounter. The fourth person W.P. told was his father, shortly after he told his mother. Finally, W.P. told the police the very same story that he had already told James, William, his mother, and his father. Thus, the motive to fabricate existed (if it did) at or before the time W.P. told James, William, his mother, and his father.

So how does the fact that W.P. was a juvenile on deferred-adjudication probation for aggravated assault provide a motive for him to make up this story? The trial judge gave appellant's attorney three different hearings outside the presence of the jury to show a plausible connection. Appellant cited *Davis* and explained that, on the day that W.P. told the police about the sexual encounters, W.P. believed that he could get into trouble because William had planned to rob appellant. He elaborated:

> I would state that the relevance is that the complaining witness has testified that one of the reasons he told his mother about this allegation, the first adult family member about it, was because of his fear of potentially getting in trouble over the circumstances surrounding William Flowers and any potential crime committed by William Flowers against Christopher Irby. Based on that, I believe that it is particularly relevant and there is a causal relationship . . . . And that he was either on bond or probation at that time, which would give him greater motivation to lie, greater motivation towards bias and to lie about the allegation given the fact that he was looking at charges . . . should there have been a crime committed against Christopher Irby. And I believe the

testimony bears out that that was his state of mind.[54]

But this argument is not logical.  First, W.P. had already told two other people about the sexual encounters, so he did not make up the story at the time he told it to his mother. Second, W.P.'s act of telling his mother this story is totally unconnected to his later act of telling the police.  Third, William had already been deterred from accosting appellant at the time W.P. told his mother this story, so any anticipated "robbery" by William had already been foiled.[55]  Fourth, even if William had succeeded in "robbing" appellant, appellant fails to suggest how William's conduct would be attributable to W.P. or how a false story of W.P.'s consensual sexual encounters would exonerate or ameliorate the conduct of either of them.  Fifth, if W.P. felt that he had a "vulnerable relationship" with law enforcement or the

---

[54] Counsel also explained,

> I believe that the day that [W.P.] made the allegation he knew that he was going to be in trouble for other offenses; that there was discussion of the fact that they were going to steal from a Wal-Mart; that they were going to rob Mr. Irby; and that his status of either being on bond or on probation for these offenses gives him motive, the type of motive that I'm entitled to inquire into under *Davis v. Alaska.*

When the trial judge asked what motive that evidence might show, counsel responded,

> The motive to lie, the motive to come up with a reason to make this allegation given the fact that, based on the other evidence that would be presented, it would appear that Mr. Irby would be the complaining witness and he [W.P.] would be the defendant.  There was talk about robbing Mr. Irby, stealing from Mr. Irby.

The trial judge ultimately held that evidence concerning W.P.'s status on deferred adjudication was not relevant.  He also held that several extraneous offenses offered by the State were not relevant.  This trial judge applied the same standard of relevance to both the defense and prosecution evidence and kept the parties focused on the main issues.

[55] Furthermore, it seems an extraordinary leap of logic to suppose that W.P. would make up a story of his own consensual, economically based, sexual encounters to protect his friend William from either committing a robbery or from getting into trouble with W.P.'s parents for intending to commit a robbery.

State, the very last thing that he would logically do is invite their scrutiny by filing a criminal complaint against someone else for sexual assault.[56]  That act would make a "vulnerable relationship" much more vulnerable.[57]

In this case, we agree with the trial judge and court of appeals that appellant failed to make a logical connection between W.P.'s testimony concerning his sexual encounters with appellant and his entirely separate probationary status.  Thus, the trial judge did not abuse his discretion in excluding this impeachment evidence because it was irrelevant.  We affirm the judgment of the court of appeals.

Delivered:    June 16, 2010

Publish

---

[56] Indeed, one could make the argument that W.P.'s willingness to go to the police and tell them about these sexual encounters, despite the fact that he was on probation and therefore "vulnerable" to having his conduct examined, buttresses the reliability of his story.  Some people, perhaps including his probation officer, might take a dim view of W.P.'s conduct of exchanging sex for money.  W.P.'s friend James had already expressed his disapproval to W.P.  By going to police, W.P. was putting himself in harm's way, assuredly not "currying favor" with them.  Furthermore, as the prosecutor suggested in her final argument, if W.P. had made up this story to "curry favor" with anyone, he would surely have made up a better story, one in which he was a true "victim" of sexual aggression instead of a willing participant in an economic transaction.

[57] At least two Texas cases have suggested that the *Davis* rationale does not apply when the witness is the victim of the charged crime because it is illogical to think that the victim reported a crime to shift suspicion away from himself.  *See Smith v. State*, 236 S.W.3d 282, 293 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (the victim-witness "could not have been trying to shift any suspicion away from herself because she was the victim."); *Gilmore v. State,* 871 S.W.2d 848, 851 (Tex. App.—Houston [14th Dist.] 1994, no pet.) (same).