COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § |  |
|---|---|---|
| RAY EDWARD BROOKINS, | | No. 08-10-00242-CR |
| | § | |
| Appellant, | | Appeal from the |
| | § | |
| v. | | 143rd Judicial District Court |
| | § | |
| THE STATE OF TEXAS, | | of Ward County, Texas |
| | § | |
| Appellee. | | (TC# 07-04-04841) |
| | § | |
| | § | |

## O P I N I O N

Ray Edward Brookins served as superintendent of the West Texas State School (WTSS), a facility operated by the Texas Youth Commission (TYC). He was indicted on two counts of improper sexual activity with J.P., who had been committed to the custody of TYC after he was adjudicated delinquent. *See* TEX.PENAL CODE ANN. § 39.04(a)(2)(West 2011)(defining the offense of improper relationship with a person in custody). A jury convicted Brookins on both counts and sentenced him to two years of incarceration. On appeal, Brookins asserts that the trial court erred by allowing a witness to testify that J.P. was being truthful and by restricting the scope of cross-examination regarding J.P.'s juvenile record. We affirm.

### TESTIMONY REGARDING TRUTHFULNESS

Brookins' first issue concerns the testimony of Texas Ranger Brian Burzynski. Burzynski initiated the investigation that led to Brookins' indictment after receiving a telephone tip from a volunteer at WTSS. Expecting to find "nothing," Burzynski went to WTSS and

interviewed J.P. While the prosecutor was questioning Burzynski about this interview, the

following exchange occurred:

Q. [W]hat were your immediate impressions after you took his statement?

A. My immediate impression was I was wrong.

Q. About what?

A. Because I didn't -- I thought that -- I didn't think that it was a credible -- what I was told over the telephone I didn't -- and why I was going there to conduct an investigation I didn't believe was accurate. I believed it was unfounded, but, of course, it needed to be checked out.

Q. And when you heard his --

A. When I finished interviewing him, I felt that . . . this was a --

At this point, defense counsel interposed an objection on the ground that the witness was about to

give an improper opinion as to whether J.P.'s statement was truthful. The court overruled the

objection, and the questioning resumed as follows:

Q. What was it specifically about his statement . . . that made you think I need to do more investigation?

A. [J.P.] was specific in what he described. And my experience in criminal investigations, especially in a sexual assault or those type investigations, is that when a victim is very specific about specific things --

Defense Counsel: Your Honor, I'm going to renew my objection as improper opinion and a comment on the weight of the evidence.

The Court: Overruled.

Q. You may answer.

A. There were very specific things which were mentioned. It's normal that whenever you have -- whenever you're conducting an investigation and you're interviewing somebody, and let's just say they're making it up, I'm

-2-

not saying that it's truthful, it's just whether it's credible, if somebody is just giving a bunch of vague -- they can't give you specifics because it's not real, and so they are always having to think to make the thing up as you're questioning them. They don't want to be specific because they'll be contradicted, you know, those are things -- so in a case where you have somebody who voluntarily is coming out with very specific information, knowing that I'm going to check it out or can check it out, that tends to give rise to the credibility.

On appeal, Brookins contends that the trial court erred in allowing Burzynski to testify that J.P. was being truthful during the interview. We review this issue for abuse of discretion. *Arzaga v. State*, 86 S.W.3d 767, 773-74 (Tex.App.--El Paso 2002, no pet.).

A witness may not give a direct opinion as to the truthfulness of another witness. *See Schutz v. State*, 957 S.W.2d 52, 59 (Tex.Crim.App. 1997); *Yount v. State*, 872 S.W.2d 706, 711 (Tex.Crim.App. 1993); *Arzaga*, 86 S.W.3d at 776. However, not all testimony that touches on another witness's truthfulness is inadmissible. For example, an expert may testify that a child sexual assault victim does not exhibit behavior indicating that her claims were the product of manipulation. *See Schutz*, 957 S.W.2d at 73. But an expert may not state whether he believes that the child was in fact manipulated. *See id*. As these examples illustrate, there is a fine line between permissible and impermissible testimony that touches on a witness's credibility. *See id*. at 60.

Burzynski's testimony is similar to testimony introduced in *Sessums v. State*, 129 S.W.3d 242, 247-48 (Tex.App.--Texarkana 2004, pet. ref'd). In *Sessums*, an expert described the factors that he considers to determine whether a child is telling the truth and then he testified that the victim exhibited those factors. 129 S.W.3d at 247. The Texarkana Court of Appeals held that this testimony was inadmissible. *Id*. at 248.

Similarly, we conclude that Burzynski's testimony crossed the line that separates permissible and impermissible testimony.  In determining where to draw the line, we believe that context is important.  Here, Burzynski began his testimony by indicating that he did not expect to find any merit to the volunteer's tip.  After taking a statement from J.P., his "immediate impression was [that he] was wrong." In explaining why he decided that he had been wrong and why he decided to investigate further,  Burzynski testified that J.P. provided specifics and "in a case where you have somebody who voluntarily is coming out with very specific information, knowing that I'm going to check it out or can check it out, that tends to give rise to the credibility."  Although he did not literally say, "I believed J.P." or "J.P. was being truthful," that was the clear implication of his testimony.  *See Gonzalez v. State*, 301 S.W.3d 393, 398 (Tex.App.--El Paso 2009, pet. ref'd)(holding that testimony was improper because it implicitly related to the credibility of a party's written statement).

The erroneous admission of testimony regarding the truthfulness of a witness is non-constitutional error, which must be disregarded unless it affected the defendant's substantial rights.  *See Barshaw v. State*, 342 S.W.3d 91, 93 (Tex.Crim.App. 2011); *see also* TEX.R.APP.P. 44.2(b).  We must reverse a conviction for non-constitutional error if we have "grave doubt" that the result of the trial was free from the substantial effect of the error.  *Barshaw*, 342 S.W.3d at 94.  On the other hand, we will not reverse if, after examining the record as a whole, we have fair assurance that the error did not influence the jury or influenced the jury only slightly.  *Id*. at 93. Our focus is not on whether the outcome of the trial was proper despite the error, but whether the error had a substantial or injurious effect on the jury's verdict.  *Id*. at 93-4.  In assessing the likelihood that the jury's decision was improperly influenced, we examine everything in the

record, including the prosecution's theory, the defense's theory, other testimony and physical evidence, jury instructions, and closing arguments. *Id*.

One of the defensive theories was that J.P. was not credible. Brookins contends that the prosecution's closing argument suggested that Burzynski believed J.P. The prosecution began its closing argument by noting that a "predator's perfect victim is one he thinks no one will believe." Yet J.P. told his story to the jury and "[i]t was that story that led to Brian Burzynski taking this investigation seriously, the story that led to him searching the defendant's home and finding all of those things that corroborated that story . . . ." Although this tended to reinforce the improper testimony, the jury instructions told the jurors that they were "the exclusive judges of the facts proved, of the credibility of the witnesses and of the weight to be given to the testimony."

The danger posed by testimony commenting on the victim's credibility is that the jury might allow the testimony to supplant its determination as to credibility. *Id*. at 94. Brookins argues that "given the official Texas Ranger imprimatur on J.P.'s version of events that only J.P. and Appellant could know, allowing the opinion of truthfulness clearly harmed Appellant." We disagree because there was ample evidence to back up J.P.'s allegations, regardless of whether Burzynski believed him. *See id*. at 95 ("Although the court of appeals considered this a 'she said, he said' case turning on the credibility of the principal parties' testimony, there was additional evidence and testimony for the jury to consider in reaching its verdict regarding the credibility of both [the victim] and appellant.").

J.P. testified that on "many occasions" he and Brookins watched pornographic DVDs in Brookins' office. On some of those occasions, Brookins would play pornographic movies on a portable DVD player, and while the movie was playing, he would perform oral sex on J.P. or

masturbate J.P. using an artificial vagina and lubricant. J.P. recalled the word "Mandingo" on the cover of one of the DVDs. He testified that Brookins also used a penis pump on him. Defense counsel did not cross-examine J.P. about any of these details.[1]

After interviewing J.P., Burzynski obtained Brookins' consent to search his office and his residence, which was located in an employee housing area adjacent to the WTSS campus. Burzynski indicated that he was looking for items that J.P. had described during his interview, such as a penis pump, a small DVD player, artificial vaginas, and pornographic DVDs, including one made by the production company "Mandingo." He found all of these items in Brookins' residence. Burzynski found Avon lotions and petroleum jelly--additional items he was looking for--in Brookins' office.

Burzynski also arranged for crime lab technicians to test the seized items, as well as Brookins' office, for the presence of semen. DNA testing revealed Brookins' and J.P.'s semen in areas of the office and J.P.'s semen inside one of the artificial vaginas.

Employees of WTSS provided additional corroboration for J.P.'s allegations. Several employees testified that Brookins would summons J.P. to his office at odd times of the day for long periods of time, that Brookins and J.P. were frequently together, and that Brookins took an unusual (and often unfairly critical) interest in J.P.[2] One person testified that in his seventeen-

---

[1] Although it is not an element of the offense, J.P. made clear that his sexual contact with Brookins was non-consensual and that he went along with it because he believed that Brookins had the power to delay his release from WTSS. *See* TEX.PENAL CODE ANN. § 39.04(a)(2)(West 2011).

[2] Some of the employees confronted Brookins about his behavior towards J.P. Brookins responded with veiled threats. For example, when one employee confronted Brookins, he asked her whether she was "trying to buy a house" and whether she "[had] bills to pay. When another employee confronted him, he reminded the employee that he was the superintendent and that "he could do whatever he wanted."

years of employment at WTSS, he had "never seen an administrator or anybody that interacted with a student like that ever." It was "absolutely" "very unusual" for an administrator to spend as much time with a student as Brookins did with J.P. The State also introduced contemporaneous "dorm logs" that documented the numerous times that J.P. was with Brookins.

Brookins did not testify at trial, but the statement that he gave to Burzynski was admitted into evidence. Brookins denied having any sexual contact with J.P. Burzynski asked Brookins about specific items that he had seized and about certain information that J.P. had provided in his statement. Brookins responded by trying to explain why J.P. would have known that he owned some of the seized items. He stated:

> I remember us talking about when he gets out, him having kids, and I impressed upon him the fact that marriage was important and so forth. In talking about that, we went to being celibate. In that conversation, I began to tell him about all the diseases out there and told him it was better to masturbate than go out there and have a bunch of women and end up dead. Then we began talking about masturbating with toys and books. I told him about masturbation toys. I told him that I did have some. He talked about he wanted a bigger penis and I told him about pumps. Then I flung a book at him which was sex materials you could order, such as pumps, movies, DVD's, artificial vaginas. I pointed out all the sex toys that I ordered including masturbators which you put over your penis and masturbate with. I showed him . . . the different kind of gels that you use . . . . I told him that I live by pornographic DVD's and video tapes. This is my explanation for why [J.P.] would know that I have all of these things.

Brookins also stated that J.P. had seen the portable DVD player in his office and that he had told J.P. about the plots of some of his pornographic DVDs. According to Brookins, this is why J.P. knew about the DVD player and the movies.

In addition to asking Brookins about J.P.'s actual allegations, Burzynski asked Brookins two control questions. Burzynski pretended that he had some evidence regarding pubic hair and circumcision to see if Brookins would offer an "explanation" regarding those issues. Indeed,

-7-

Brookins did explain why J.P. would have known that he is circumcised and that he cuts his pubic hair. The jury could have concluded that Brookins' statement reflected negatively on his credibility and tended to validate J.P.'s allegations.

Having considered the record as a whole, including the evidence corroborating J.P.'s allegations, we have no doubt that the result of the trial was free from the substantial effect of the error.[3] Brookins' first issue is overruled.

#### JUVENILE ADJUDICATIONS

In his second issue, Brookins argues that the trial court should have allowed him to cross-examine J.P. about his juvenile record. Immediately before J.P. testified, the defense argued that the jury should know that J.P. was at WTSS for an aggravated robbery, that he was there for "a very, very serious crime," and that he "was a progressive sanctioned level offender," who "was on the far end of the punitive scale." The defense argued that this information was relevant, in part, because the prosecution had "witnesses come up and talk about how [J.P.] was just this lovely child, that he was just a joy to work with." But in fact, "this was not an individual that was sent to TYC simply because he had violated some curfew rules . . . ." The defense cited *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), as support for its argument. The prosecution agreed to have J.P. testify on direct that he had committed an aggravated robbery, but opposed any cross-examination about his prior juvenile record. The court ruled in the prosecution's favor. In accordance with this ruling, J.P. testified that he was

---

[3] During the punishment phase, the State presented evidence that Brookins engaged in improper sexual activity with other juveniles at WTSS, with an inmate at a prison where he worked, and with another youth for whom he served as a foster parent. The State also presented evidence that Brookins violated TYC policies in other ways, such as by leaving juveniles in restraints for extended periods of time.

sent to TYC for three years because he committed an aggravated robbery when he was fifteen years old.

On appeal, Brookins argues that he should have been allowed to cross-examine J.P. regarding his previous adjudications of delinquent conduct. We review this issue for abuse of discretion. *See Irby v. State*, 327 S.W.3d 138, 154 (Tex.Crim.App. 2010).

Evidence of juvenile adjudications is generally inadmissible, with two exceptions: in proceedings conducted pursuant to the Juvenile Justice Code in which the juvenile is a party, and when required by the state or federal constitution. *See* TEX.R.EVID. 609(d). Contrary to Brookins' suggestion, the first exception does not apply because his prosecution was not a juvenile proceeding and J.P. was not a party to the case. Therefore, J.P.'s juvenile record was inadmissible unless its admission was constitutionally required.

Relying on *Davis v. Alaska*, Brookins argues that introduction of evidence about J.P.'s juvenile record was constitutionally required. In *Davis*, a juvenile testified that he saw the defendant standing near a car and holding a crowbar at the place where a stolen, empty safe was later discovered. 415 U.S. at 309-10, 94 S.Ct. at 1107. When this event occurred, and at the time of trial, the juvenile was on probation, having been adjudicated delinquent for burglarizing two cabins. *Id*. at 310-11, 94 S.Ct. at 1107. The trial court refused to allow the defense to introduce evidence of the juvenile's probationary status. *Id*. at 311, 94 S.Ct. at 1108. Defense counsel had "made it clear that he would not introduce [the juvenile's] juvenile adjudication as a general impeachment of [his] character as a truthful person" or "to call [his] good character into question," but to probe for bias and prejudice. *Id*., 94 S.Ct. at 1108. The Supreme Court held that the evidence was "admissible to afford a basis for an inference of undue pressure because of

[the juvenile's] vulnerable status as a probationer, as well as of [the juvenile's] possible concern that he might be a suspect in the investigation." *Id*. at 317-18, 94 S.Ct. at 1111 [Citation and footnote omitted]. Because the evidence was excluded, the defendant's right to effective cross-examination was violated. *Id*. at 318, 94 S.Ct. at 1111.

The Court of Criminal Appeals has held that *Davis* does not "require that courts permit the use of prior juvenile acts of misconduct or adjudications for general impeachment of credibility." *Irby*, 327 S.W.3d at 147. Instead, it "targets only a specific mode of impeachment--bias and motive--when the cross-examiner can show a logical connection between the evidence suggesting bias or motive and the witness's testimony." *Id*. at 152.

It is obvious that Brookins wished to use J.P.'s juvenile record for general impeachment of his credibility, or in his attorney's words, to show that he was not a "lovely child." Brookins has made no effort to demonstrate that J.P.'s juvenile record made him biased against Brookins or gave him a motive to fabricate his allegations. Accordingly, the trial court did not abuse its discretion by prohibiting the defense from cross-examining J.P. about his juvenile record.[4] Brookins' second issue is overruled.

### CONCLUSION

Having overruled Brookins' appellate issues, we affirm the judgment of the trial court.

---

[4] We also note that the jury was made aware that J.P. had been on the wrong side of the law on more than one occasion. In his opening statement, defense counsel told the jury that WTSS was "where they send the worst of the worst juvenile offenders," that J.P. "is now a guest of the Texas adult prison system," and "[t]hat's the person . . . you're going to have to believe beyond a reasonable doubt." In addition to hearing evidence that J.P. had been adjudicated delinquent for aggravated robbery, the jury also heard evidence that he was serving a nine-year prison sentence for robbery at the time of trial. An employee of WTSS admitted that he had previously stated that J.P. "was in high need of capital offender treatment." Finally, J.P. himself testified that at the time he was interviewed by Burzynski, he "had been dealing with the law . . . since a young age."

-10-

December 14, 2011

CHRISTOPHER ANTCLIFF, Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.

(Do Not Publish)