COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|                          | §  |                            |
| ------------------------ | -- | -------------------------- |
| RAY EDWARD BROOKINS,      | §  | No. 08-10-00243-CR         |
| Appellant,               | §  | Appeal from the            |
| v.                       | §  | 143rd Judicial District Court |
| THE STATE OF TEXAS,      | §  | of Ward County, Texas      |
| Appellee.                | §  | (TC# 07-04-04842)          |
|                          | §  |                            |
|                          | §  |                            |

## **O P I N I O N**

Ray Edward Brookins served as superintendent of the West Texas State School (WTSS), a facility operated by the Texas Youth Commission (TYC). He was indicted on two counts of improper relationship between educator and student. The indictment alleged that he engaged in sexual activity with J.P., who had been committed to the custody of TYC after being adjudicated delinquent. A jury convicted Brookins on both counts and sentenced him to ten years of incarceration. On appeal, Brookins asserts that the trial court erred by allowing a witness to testify that J.P. was being truthful, that the evidence was legally insufficient in two respects, and that the trial court erred by restricting the scope of cross-examination regarding J.P.'s juvenile record. We affirm.

**TESTIMONY REGARDING TRUTHFULNESS**

Brookins' first issue concerns the testimony of Texas Ranger Brian Burzynski. Burzynski initiated the investigation that led to Brookins' indictment after receiving a telephone tip from a

volunteer at WTSS. Expecting to find "nothing," Burzynski went to WTSS and interviewed J.P.

While the prosecutor was questioning Burzynski about this interview, the following exchange

occurred:

> Q. [W]hat were your immediate impressions after you took his statement?
>
> A. My immediate impression was I was wrong.
>
> Q. About what?
>
> A. Because I didn't -- I thought that -- I didn't think that it was a credible -- what I was told over the telephone I didn't -- and why I was going there to conduct an investigation I didn't believe was accurate. I believed it was unfounded, but, of course, it needed to be checked out.
>
> Q. And when you heard his --
>
> A. When I finished interviewing him, I felt that . . . this was a --

At this point, defense counsel interposed an objection on the ground that the witness was about to

give an improper opinion as to whether J.P.'s statement was truthful. The court overruled the

objection, and the questioning resumed as follows:

> Q. What was it specifically about his statement . . . that made you think I need to do more investigation?
>
> A. [J.P.] was specific in what he described. And my experience in criminal investigations, especially in a sexual assault or those type investigations, is that when a victim is very specific about specific things --
>
> Defense Counsel: Your Honor, I'm going to renew my objection as improper opinion and a comment on the weight of the evidence.
>
> The Court: Overruled.
>
> Q. You may answer.
>
> A. There were very specific things which were mentioned. It's normal that

whenever you have -- whenever you're conducting an investigation and you're interviewing somebody, and let's just say they're making it up, I'm not saying that it's truthful, it's just whether it's credible, if somebody is just giving a bunch of vague -- they can't give you specifics because it's not real, and so they are always having to think to make the thing up as you're questioning them. They don't want to be specific because they'll be contradicted, you know, those are things -- so in a case where you have somebody who voluntarily is coming out with very specific information, knowing that I'm going to check it out or can check it out, that tends to give rise to the credibility.

On appeal, Brookins contends that the trial court erred in allowing Burzynski to testify that J.P. was being truthful during the interview. We review this issue for abuse of discretion. *Arzaga v. State*, 86 S.W.3d 767, 773-74 (Tex.App.--El Paso 2002, no pet.).

A witness may not give a direct opinion as to the truthfulness of another witness. *See Schutz v. State*, 957 S.W.2d 52, 59 (Tex.Crim.App. 1997); *Yount v. State*, 872 S.W.2d 706, 711 (Tex.Crim.App. 1993); *Arzaga*, 86 S.W.3d at 776. However, not all testimony that touches on another witness's truthfulness is inadmissible. For example, an expert may testify that a child sexual assault victim does not exhibit behavior indicating that her claims were the product of manipulation. *See Schutz*, 957 S.W.2d at 73. But an expert may not state whether he believes that the child was in fact manipulated. *See id*. As these examples illustrate, there is a fine line between permissible and impermissible testimony that touches on a witness's credibility. *See id*. at 60.

Burzynski's testimony is similar to testimony introduced in *Sessums v. State*, 129 S.W.3d 242, 247-48 (Tex.App.--Texarkana 2004, pet. ref'd). In *Sessums*, an expert described the factors that he considers to determine whether a child is telling the truth and then he testified that the victim exhibited those factors. 129 S.W.3d at 247. The Texarkana Court of Appeals held that

this testimony was inadmissible. *Id.* at 248.

Similarly, we conclude that Burzynski's testimony crossed the line that separates permissible and impermissible testimony. In determining where to draw the line, we believe that context is important. Here, Burzynski began his testimony by indicating that he did not expect to find any merit to the volunteer's tip. After taking a statement from J.P., his "immediate impression was [that he] was wrong." In explaining why he decided that he had been wrong and why he decided to investigate further, Burzynski testified that J.P. provided specifics and "in a case where you have somebody who voluntarily is coming out with very specific information, knowing that I'm going to check it out or can check it out, that tends to give rise to the credibility." Although he did not literally say, "I believed J.P." or "J.P. was being truthful," that was the clear implication of his testimony. *See Gonzalez v. State*, 301 S.W.3d 393, 398 (Tex.App.--El Paso 2009, pet. ref'd)(holding that testimony was improper because it implicitly related to the credibility of a party's written statement).

The erroneous admission of testimony regarding the truthfulness of a witness is non-constitutional error, which must be disregarded unless it affected the defendant's substantial rights. *See Barshaw v. State*, 342 S.W.3d 91, 93 (Tex.Crim.App. 2011); *see also* TEX.R.APP.P. 44.2(b). We must reverse a conviction for non-constitutional error if we have "grave doubt" that the result of the trial was free from the substantial effect of the error. *Barshaw*, 342 S.W.3d at 94. On the other hand, we will not reverse if, after examining the record as a whole, we have fair assurance that the error did not influence the jury or influenced the jury only slightly. *Id*. at 93. Our focus is not on whether the outcome of the trial was proper despite the error, but whether the error had a substantial or injurious effect on the jury's verdict. *Id*. at 93-4. In assessing the

-4-

likelihood that the jury's decision was improperly influenced, we examine everything in the record, including the prosecution's theory, the defense's theory, other testimony and physical evidence, jury instructions, and closing arguments. *Id*.

One of the defensive theories was that J.P. was not credible. Brookins contends that the prosecution's closing argument suggested that Burzynski believed J.P. The prosecution began its closing argument by noting that a "predator's perfect victim is one he thinks no one will believe." Yet J.P. told his story to the jury and "[i]t was that story that led to Brian Burzynski taking this investigation seriously, the story that led to him searching the defendant's home and finding all of those things that corroborated that story . . . ." Although this tended to reinforce the improper testimony, the jury instructions told the jurors that they were "the exclusive judges of the facts proved, of the credibility of the witnesses and of the weight to be given to the testimony."

The danger posed by testimony commenting on the victim's credibility is that the jury might allow the testimony to supplant its determination as to credibility. *Id*. at 94. Brookins argues that "given the official Texas Ranger imprimatur on J.P.'s version of events that only J.P. and Appellant could know, allowing the opinion of truthfulness clearly harmed Appellant." We disagree because there was ample evidence to back up J.P.'s allegations, regardless of whether Burzynski believed him. *See id*. at 95 ("Although the court of appeals considered this a 'she said, he said' case turning on the credibility of the principal parties' testimony, there was additional evidence and testimony for the jury to consider in reaching its verdict regarding the credibility of both [the victim] and appellant.").

J.P. testified that on "many occasions" he and Brookins watched pornographic DVDs in Brookins' office. On some of those occasions, Brookins would play pornographic movies on a

portable DVD player, and while the movie was playing, he would perform oral sex on J.P. or masturbate J.P. using an artificial vagina and lubricant. J.P. recalled the word "Mandingo" on the cover of one of the DVDs. He testified that Brookins also used a penis pump on him. Defense counsel did not cross-examine J.P. about any of these details.[1]

After interviewing J.P., Burzynski obtained Brookins' consent to search his office and his residence, which was located in an employee housing area adjacent to the WTSS campus. Burzynski indicated that he was looking for items that J.P. had described during his interview, such as a penis pump, a small DVD player, artificial vaginas, and pornographic DVDs, including one made by the production company "Mandingo." He found all of these items in Brookins' residence. Burzynski found Avon lotions and petroleum jelly--additional items he was looking for--in Brookins' office.

Burzynski also arranged for crime lab technicians to test the seized items, as well as Brookins' office, for the presence of semen. DNA testing revealed Brookins' and J.P.'s semen in areas of the office and J.P.'s semen inside one of the artificial vaginas.

Employees of WTSS provided additional corroboration for J.P.'s allegations. Several employees testified that Brookins would summons J.P. to his office at odd times of the day for long periods of time, that Brookins and J.P. were frequently together, and that Brookins took an unusual (and often unfairly critical) interest in J.P.[2] One person testified that in his seventeen-

---

[1] Although it is not an element of the offense, J.P. made clear that his sexual contact with Brookins was non-consensual and that he went along with it because he believed that Brookins had the power to delay his release from WTSS. *See* TEX.PENAL CODE ANN. § 21.12 (West 2011).

[2] Some of the employees confronted Brookins about his behavior towards J.P. Brookins responded with veiled threats. For example, when one employee confronted Brookins, he asked her whether she was "trying to buy a house" and whether she "[had] bills to pay. When another

years of employment at WTSS, he had "never seen an administrator or anybody that interacted with a student like that ever." It was "absolutely" "very unusual" for an administrator to spend as much time with a student as Brookins did with J.P. The State also introduced contemporaneous "dorm logs" that documented the numerous times that J.P. was with Brookins.

Brookins did not testify at trial, but the statement that he gave to Burzynski was admitted into evidence. Brookins denied having any sexual contact with J.P. Burzynski asked Brookins about specific items that he had seized and about certain information that J.P. had provided in his statement. Brookins responded by trying to explain why J.P. would have known that he owned some of the seized items. He stated:

> I remember us talking about when he gets out, him having kids, and I impressed upon him the fact that marriage was important and so forth. In talking about that, we went to being celibate. In that conversation, I began to tell him about all the diseases out there and told him it was better to masturbate than go out there and have a bunch of women and end up dead. Then we began talking about masturbating with toys and books. I told him about masturbation toys. I told him that I did have some. He talked about he wanted a bigger penis and I told him about pumps. Then I flung a book at him which was sex materials you could order, such as pumps, movies, DVD's, artificial vaginas. I pointed out all the sex toys that I ordered including masturbators which you put over your penis and masturbate with. I showed him . . . the different kind of gels that you use . . . . I told him that I live by pornographic DVD's and video tapes. This is my explanation for why [J.P.] would know that I have all of these things.

Brookins also stated that J.P. had seen the portable DVD player in his office and that he had told J.P. about the plots of some of his pornographic DVDs. According to Brookins, this is why J.P. knew about the DVD player and the movies.

In addition to asking Brookins about J.P.'s actual allegations, Burzynski asked Brookins

---

employee confronted him, he reminded the employee that he was the superintendent and that "he could do whatever he wanted."

two control questions. Burzynski pretended that he had some evidence regarding pubic hair and circumcision to see if Brookins would offer an "explanation" regarding those issues. Indeed, Brookins did explain why J.P. would have known that he is circumcised and that he cuts his pubic hair. The jury could have concluded that Brookins' statement reflected negatively on his credibility and tended to validate J.P.'s allegations.

Having considered the record as a whole, including the evidence corroborating J.P.'s allegations, we have no doubt that the result of the trial was free from the substantial effect of the error.[3] Brookins' first issue is overruled.

### SUFFICIENCY OF THE EVIDENCE

In his second issue, Brookins argues that the evidence is legally insufficient to sustain a conviction for improper relationship between educator and student. In reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict to determine whether a rational jury could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex.Crim.App. 2010). We must defer to the jury's credibility and weight-of-the-evidence determinations. *Brooks*, 323 S.W.3d at 899.

"An employee of a public . . . secondary school commits an offense if the employee . . . engages in sexual contact, sexual intercourse, or deviate sexual intercourse with a person who is enrolled in a public . . . secondary school at which the employee works." TEX.PENAL CODE ANN.

---

[3] During the punishment phase, the State presented evidence that Brookins engaged in improper sexual activity with other juveniles at WTSS, with an inmate at a prison where he worked, and with another youth for whom he served as a foster parent. The State also presented evidence that Brookins violated TYC policies in other ways, such as by leaving juveniles in restraints for extended periods of time.

§ 21.12(a)(1)(West Supp. 2011). Brookins asserts that the evidence is insufficient to establish that WTSS is a public secondary school. Although he frames this issue as a legal sufficiency challenge, he argues the issue as one of statutory construction. In essence, Brookins contends that a juvenile correctional facility cannot be a public secondary school as a matter of law.

When words are not defined in a statute, they are given their plain meaning unless the statute clearly shows that they were used in some other sense. *Ex parte Morales*, 212 S.W.3d 483, 499 (Tex.App.--Austin 2006, pet. ref'd)(discussing this statute). Noting that the statute does not define what a public secondary school is, Brookins asserts that "one rarely thinks of a secure juvenile detention facility . . . when discussing your typical high school." Therefore, he argues, "the typical high school must have also been what the legislature had in mind." He also relies on *Black's Law Dictionary*, which defines "public" as "[o]pen or available for all to use." BLACK'S LAW DICTIONARY 1348 (9th ed. 2009). WTSS is not open or available for all to use. But, as the State observes, neither is any other high school. All schools have age and residency requirements. *See* TEX.EDUC.CODE ANN. § 25.001(b)(West Supp. 2011).

Brookins points out that, except for funding purposes, TYC is specifically excluded from the requirements of the Texas Education Code. *See id*. at § 1.001(b), § 30.101 (West 2006). He therefore argues that TYC's educational programs do not cover substantially the same field as a typical high school. We disagree.

A subchapter of the Education Code is devoted to TYC facilities. "The purpose of this subchapter is to provide the state available school fund apportionment to children committed to the Texas Youth Commission. To provide the state available school fund apportionment for educational purposes, *the educational programs provided to those children are considered to be*

-9-

*educational services provided by public schools*." TEX.EDUC.CODE ANN. § 30.101 [Emphasis added]. Like typical high schools, funding for TYC's educational programs is based on average daily attendance. *See id*. at § 30.102(a). WTSS was listed as its own school district on the Texas Education Agency's website. TYC's teachers, librarians, and counselors are compensated according to the same schedule that applies to other school districts. *See id*. at § 30.102(b). Other school districts are required to grant credits toward high school graduation for courses that a student successfully completed at TYC. *Id*. at § 30.104(a). A student may even graduate and receive a high school diploma from TYC if the student successfully completes the curriculum requirements identified by the State Board of Education. *Id*. at § 30.104(b). Thus, TYC educational programs cover substantially the same field as typical high schools.

One court has suggested that the Legislature created the offense of improper relationship between educator and student because "school employees, whether possessing a teaching certificate or not, are given unique access to students, and are thereby vested with great trust and confidence by the school, parents, and public," and that the Legislature "sought to preserve or strengthen that trust by unequivocally prohibiting school employees from misusing their access to students as a conduit for sex." *Ex parte Morales*, 212 S.W.3d at 496. These rationales apply just as forcefully to the West Texas State School as they do to a "typical high school." The fact that WTSS had elements of a correctional facility does not negate its status as a public secondary school within the meaning of the applicable penal statute. The Legislature contemplated that conduct constituting this offense might also constitute another offense and it provided that the conduct could be prosecuted under both theories. *See* TEX.PENAL CODE ANN. § 21.12(c)(West

Supp. 2011); *Ex parte Morales*, 212 S.W.3d at 487.[4]

Turning to the evidence in this case, the WTSS facilities included a school building with classrooms and a library. There were teachers, a principal, and an assistant principal. In accord with the statutes discussed above, the State presented testimony that WTSS received funding based on the number of students enrolled and that students could receive a high school diploma at WTSS or transfer their credits to another high school. In addition, WTSS students were required to take the TAKS test. Two witnesses testified directly that WTSS was a public secondary school.

Viewing the evidence in the light most favorable to the verdict, and in conjunction with the applicable law, we conclude that the evidence was sufficient to establish that WTSS was a public secondary school.

Brookins further argues that the evidence was legally insufficient to establish that J.P. was enrolled as a student at WTSS. He notes that J.P. obtained a GED before the offenses occurred, and he contends that J.P.'s subsequent class attendance was merely a condition of incarceration. J.P.'s caseworker at WTSS testified that juveniles could continue working toward a high school diploma even if they had obtained a GED. One of J.P.'s progress reports was admitted into evidence. It showed that after he obtained his GED, J.P. was taking five classes, including algebra, history, and English, and that he received grades for the classes. J.P. testified that he was enrolled as a student at WTSS and that he attended classes every weekday. This evidence was sufficient to establish that J.P. was enrolled as a student. Brookins' second issue is

---

[4] Brookins was also prosecuted for improper sexual activity with a person in custody. *See* TEX.PENAL CODE ANN. § 39.04(a)(2)(West 2011).

overruled.

## JUVENILE ADJUDICATIONS

In his third issue, Brookins argues that the trial court should have allowed him to cross-examine J.P. about his juvenile record. Immediately before J.P. testified, the defense argued that the jury should know that J.P. was at WTSS for an aggravated robbery, that he was there for "a very, very serious crime," and that he "was a progressive sanctioned level offender," who "was on the far end of the punitive scale." The defense argued that this information was relevant, in part, because the prosecution had "witnesses come up and talk about how [J.P.] was just this lovely child, that he was just a joy to work with." But in fact, "this was not an individual that was sent to TYC simply because he had violated some curfew rules . . . ." The defense cited *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), as support for its argument. The prosecution agreed to have J.P. testify on direct that he had committed an aggravated robbery, but opposed any cross-examination about his prior juvenile record. The court ruled in the prosecution's favor. In accordance with this ruling, J.P. testified that he was sent to TYC for three years because he committed an aggravated robbery when he was fifteen years old.

On appeal, Brookins argues that he should have been allowed to cross-examine J.P. regarding his previous adjudications of delinquent conduct. We review this issue for abuse of discretion. *See Irby v. State*, 327 S.W.3d 138, 154 (Tex.Crim.App. 2010).

Evidence of juvenile adjudications is generally inadmissible, with two exceptions: in proceedings conducted pursuant to the Juvenile Justice Code in which the juvenile is a party, and when required by the state or federal constitution. *See* TEX.R.EVID. 609(d). Contrary to

-12-

Brookins' suggestion, the first exception does not apply because his prosecution was not a juvenile proceeding and J.P. was not a party to the case. Therefore, J.P.'s juvenile record was inadmissible unless its admission was constitutionally required.

Relying on *Davis v. Alaska*, Brookins argues that introduction of evidence about J.P.'s juvenile record was constitutionally required. In *Davis*, a juvenile testified that he saw the defendant standing near a car and holding a crowbar at the place where a stolen, empty safe was later discovered. 415 U.S. at 309-10, 94 S.Ct. at 1107. When this event occurred, and at the time of trial, the juvenile was on probation, having been adjudicated delinquent for burglarizing two cabins. *Id*. at 310-11, 94 S.Ct. at 1107. The trial court refused to allow the defense to introduce evidence of the juvenile's probationary status. *Id*. at 311, 94 S.Ct. at 1108. Defense counsel had "made it clear that he would not introduce [the juvenile's] juvenile adjudication as a general impeachment of [his] character as a truthful person" or "to call [his] good character into question," but to probe for bias and prejudice. *Id*., 94 S.Ct. at 1108. The Supreme Court held that the evidence was "admissible to afford a basis for an inference of undue pressure because of [the juvenile's] vulnerable status as a probationer, as well as of [the juvenile's] possible concern that he might be a suspect in the investigation." *Id*. at 317-18, 94 S.Ct. at 1111 (citation and footnote omitted). Because the evidence was excluded, the defendant's right to effective cross-examination was violated. *Id.* at 318, 94 S.Ct. at 1111.

The Court of Criminal Appeals has held that *Davis* does not "require that courts permit the use of prior juvenile acts of misconduct or adjudications for general impeachment of credibility." *Irby*, 327 S.W.3d at 147. Instead, it "targets only a specific mode of impeachment-- bias and motive--when the cross-examiner can show a logical connection between the evidence

-13-

suggesting bias or motive and the witness's testimony." *Irby*, 327 S.W.3d at 152.

It is obvious that Brookins wished to use J.P.'s juvenile record for general impeachment of his credibility, or in his attorney's words, to show that he was not a "lovely child." Brookins has made no effort to demonstrate that J.P.'s juvenile record made him biased against Brookins or gave him a motive to fabricate his allegations. Accordingly, the trial court did not abuse its discretion by prohibiting the defense from cross-examining J.P. about his juvenile record.[5] Brookins' third issue is overruled.

---

[5] We also note that the jury was made aware that J.P. had been on the wrong side of the law on more than one occasion. In his opening statement, defense counsel told the jury that WTSS was "where they send the worst of the worst juvenile offenders," that J.P. "is now a guest of the Texas adult prison system," and "[t]hat's the person . . . you're going to have to believe beyond a reasonable doubt." In addition to hearing evidence that J.P. had been adjudicated delinquent for aggravated robbery, the jury also heard evidence that he was serving a nine-year prison sentence for robbery at the time of trial. An employee of WTSS admitted that he had previously stated that J.P. "was in high need of capital offender treatment." Finally, J.P. himself testified that at the time he was interviewed by Burzynski, he "had been dealing with the law . . . since a young age."

**CONCLUSION**

Having overruled Brookins' appellate issues, we affirm the judgment of the trial court, with one modification. The judgment does not reflect the date of sentencing. We therefore modify the judgment to state that Brookins was sentenced on April 23, 2010.


December 14, 2011

CHRISTOPHER ANTCLIFF, Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.

(Do Not Publish)