**Opinion issued April 9, 2013**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-12-00164-CR

_____

**THAXTON DURELLE JOHNSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Case No. 1258552**

---

## MEMORANDUM OPINION

A jury found appellant, Thaxton Durelle Johnson, guilty of the offense of

capital murder[1] and assessed his punishment at confinement for life.  In five points

---

[1]   *See* TEX. PENAL CODE ANN. § 19.03 (Vernon Supp. 2012).

of error, appellant contends that the trial court erred in prohibiting him from cross-examining two witnesses in violation of his right of confrontation.[2] We affirm.

## Background

Houston Police Department ("HPD") Officer J. Vidal testified that he was dispatched to a house at 7414 Breezeway Drive in Houston, Texas at 3:00 a.m. on February 14, 2010 in response to a shooting. When he arrived, emergency medical personnel were trying to revive the complainant, William Thompson, who had been shot. Vidal noticed that the door to the house had been forced open and was broken and splintered apart. Vidal spoke to Susan Griert, the complainant's girlfriend, who told him that she had heard the sound of breaking glass before the complainant called to her for help from the bedroom. He also saw broken glass on the floor and noted that it appeared that an object had fallen and broken.

HPD Crime Scene Unit Officer W. Tompkins testified that he was also dispatched to the crime scene at 4:00 a.m. where he spoke with Griert and tested her for gunshot residue. He noted that she had blood on her hands and seemed "flustered" and "bewildered." Tompkins saw that the front door to the house had been kicked open, the doorframe broken off, and there was a dark-colored Camaro parked in front of the house. And investigators found a cloth pool cue bag near the front door of the house. He saw the complainant, with two gunshot wounds on his

---

[2] *See* U.S. CONST. amend. VI.

body, lying on the living room floor where emergency personnel had moved him. Tompkins further noted that he found a spent .22 casing as well as an unfired .22 bullet.

Nathan Golden, a friend of the complainant and Griert, testified that he would often spend time at the complainant's home and knew appellant because he played basketball with other kids in the neighborhood. Golden explained that the complainant and Griert would hire appellant to do odd jobs like mowing their lawn, painting, and running errands, allowing him to drive their black Camaro. Appellant's uncle and sister lived in the same neighborhood, and some time in 2009, appellant had shown Golden several "rusty" rifles at his uncle's house, including a .22 rifle. Golden noted that the complainant and appellant had had a "falling out" about some items that the complainant believed had been stolen from his house; Golden understood, thus, that appellant was no longer allowed at the complainant's house.

Griert testified that she had been friends with the complainant for 18 years and their friendship developed into a romantic relationship. She explained that they initially lived in her home, but eventually moved to the complainant's home on Breezeway Drive where they frequently socialized with other neighbors. Griert and the complainant became friends with appellant when he played basketball in the neighborhood and passed through going to different relatives' homes. And she

3

and the complainant would pay appellant, who they would see every day, to do odd jobs at both of their houses. Griert explained that she allowed appellant to drive their cars, including the black Camaro, and bought him a cellular telephone so she could contact him to run errands. Griert noted that the complainant and appellant had a "falling out" in October 2009, when the complainant told her not to allow appellant into their house. And although appellant had come to the house the week before the complainant was murdered, he left when Griert told him that he had to leave.

Griert explained that on February 13, 2010, she and the complainant spent the day drinking, eating, and watching movies. They both eventually fell asleep on the Futon couch in their living room. Griert was awakened by the sound of glass breaking, and she heard the complainant call out her nickname, "Blue," from their bedroom. Griert then found the complainant on the floor in the bedroom with blood "gushing" out of his mouth. She telephoned for emergency assistance and began administering CPR. Although Griert did not hear the door being broken or any gunshots, she did hear glass breaking and the complainant calling for her.

HPD Homicide Detective C. Abbondandolo testified that at 4:00 a.m. on February 14, 2010 he was called to the crime scene where he talked to HPD officers on the scene. Abbondandolo noted that Griert was sitting in the back of a patrol car, and he obtained her consent to process the crime scene. Abbondandolo

4

explained that Griert, who was "very upset" and "confused," was taken to a police station where he interviewed her.

Detective Abbondandolo explained that early in his investigation, he was given appellant's name and spoke to his grandmother, Shirley Johnson. And Abbondandolo interviewed Stefan Kenndy, a juvenile, with his older brother, Joseph Kenndy, and Lynetta Proffitt, who identified herself as Stefan's guardian. Abbondandolo obtained several written statements from Stefan and other witnesses, including appellant. Abbondandolo noted that appellant told him during an interview that he sold his .22 caliber "pistol" to Stefan for $250. And Larry Johnson, appellant's uncle, contacted Abbondandolo by telephone a month after the murder and invited him to his home at 9206 Guywood, where he directed Abbondandolo to the rifle that had been left in the easement behind the house. The Johnson home is in the same neighborhood as the home of the complainant and Griert. Abbondandolo called HPD Officer M. Perez out to Johnson's home where Perez took measurements and photographs and retrieved the .22 rifle, with unfired casings still inside, from an easement behind the property.

HPD Crime Lab firearms examiner, Tammy Reed, testified that she tested the .22 rifle recovered from behind Johnson's house and compared the bullets found with the rifle and the bullets recovered from the complainant's body. Based

on her experience, Reed opined that the .22 rifle found behind Johnson's house was the gun used to kill the complainant.

Johnson testified that appellant lived with him and his mother, Shirley, for several months at her house. He noted that on February 13, 2010 they had a barbeque to which appellant came with a young man who had not been invited. Johnson explained that he had previously found a .22 rifle in his garage that belonged to appellant, and sometime later, appellant told him that there was "probably" a weapon on his property. Johnson then called Detective Abbondandolo, and they found the weapon, which was the same .22 rifle that he had previously seen in his garage.

Joseph Kennedy testified that appellant was a friend of his younger brothers, Stefan and Brandon. Kennedy, who spoke to appellant on the telephone when appellant called his mother's house, explained that they had argued because appellant asked to speak to Brandon and then told Kennedy that he would "kill" Brandon and Stefan if they "snitched" on him.

Stefan testified that he was a friend of appellant, who invited him to the February 13 barbeque at Johnson's house. That night, appellant and Stefan "hung out" in the garage where appellant was drinking, smoking, and taking pills. Stefan left the party with appellant after he started acting "weird" and "sort of tripping and acting out." As they walked down the street, appellant began to say that he

6

was "going to get [his] car." Stefan explained that they reached a corner and saw a black Camaro that appellant said was his car; they then stood near the mailbox of the driveway of the complainant's house. As they stood at the mailbox, appellant continued to say several times "I want to get my motherfucking car." Suddenly, appellant started to "cut through the grass." He then came back toward Stefan and lifted his shirt, revealing the wooden handle of a gun. Stefan then pushed appellant and ran. As he ran away, Stefan heard a loud noise that sounded "like a door being kicked in." And Stefan just ran faster toward his mother's home on nearby Williams Street. Stefan explained that he had seen appellant with a different gun at Johnson's house several months before the shooting. And he recognized the pool cue bag, which he had also seen in Johnson's garage with the "brown butt" of a gun sticking out of it as one belonging to appellant. Stefan also had seen in Johnson's garage, on the night of the barbeque, the pool cue bag with the "brown butt" of a gun sticking out of it. Stefan did not know what a .22 rifle looked like, and he had never fired one before. And he explained that his brother Joseph and his wife were present when Stefan spoke to Detective Abbondandolo and, although he was not truthful at first, he told the truth after they talked to him and encouraged him to do so.

Kristal Roberson, Stefan and Joseph's sister-in-law, testified that she knew appellant and had lived with him and another friend for a short time. She

7

explained that appellant telephoned her looking for Stefan. He spoke about a door being "kicked in," and he stated that he did not know anyone was home, someone started yelling, and he "just started firing off" shots. Appellant told Roberson that Stefan had run and appellant did not know where he had gone. Appellant telephoned Roberson again later and talked about "the rumors" that were starting to circulate around the neighborhood about the murder. Roberson explained that she told HPD Detective Semmelrock in a recorded statement on March 10, 2010 that appellant told her that he had robbed someone to get money and marijuana and had "ditched the gun."

Shirley Johnson, appellant's grandmother, testified that on February 13, 2010, she had a party at her home to which appellant came with a young man that she did not know. Appellant acted "normal" that evening, and she did not notice anything unusual. Shirley noted that, although she had seen appellant and the young man out in the garage, she did not know when either left the party because she went to bed before the party ended. Shirley explained that, although she went into the garage twice a week to do laundry, she had not seen a rifle in her garage.

Curtis Nelson testified that he attended the February 13 barbeque at the Johnson house. Nelson saw appellant and a "short and pudgy" young man at the party. He noted that appellant was "quiet," but he did not see anything unusual. Although Nelson did not see appellant and the young man leave, he did notice at

8

one point that they were gone.  Sometime after noticing that appellant was gone, Nelson saw him again and he acted "normal."  And Nelson did not see the .22 rifle or any other weapon in the garage that night or at any other time.

Appellant testified that he met the complainant in 2008 while he was living with his relatives at 9206 Guywood.  Appellant explained that he did odd jobs for the complainant and Griert, but he saw them less often by the fall of 2009.  The complainant allowed appellant to drive all of his cars, and appellant could take "any car at any time" when told to do so.  Appellant acknowledged that he smoked marijuana every day at the complainant's house, but in January 2010, appellant moved to an apartment so he was no longer living in the neighborhood.  Appellant explained that he invited Stefan to the Johnsons' February 13 barbeque because Stefan had asked him for some marijuana.  Appellant retrieved the marijuana from a cabinet in the Johnsons' garage when no one was looking.  Appellant and Stefan arrived at the party at around 11:30 p.m. and left at around 12:30 a.m. to step out and smoke the marijuana.  Appellant noted that he went back to the party and Stefan left.  He did not know where Stefan went after the party and when appellant returned to the house, only Curtis Nelson and another man named "Roshawn" were still in the garage.  Appellant then played another game of pool and went into the house.  And he denied going to the complainant's house and shooting him.

Appellant explained that, at one time, he owned the .22 rifle that was used to kill the complainant, but when Johnson told him to get rid of the gun, he sold it to Stefan for $40 in late January or early February of 2010. Appellant had the gun at Johnson's house, but he did not "keep" it there. He opined that Nathan Golden was "lying" when he testified that appellant had shown him guns at Johnson's house. And appellant noted that although he had also owned the pool cue bag, the "bag went with the gun" when he sold it to Stefan.

Appellant denied telephoning Roberson and noted that he had not spoken to her since the fall of 2009. And he had never had Roberson's cellular telephone number even though they had a sexual relationship. Appellant also testified that he had not made any threats against Brandon or Stefan so they would not "snitch" on him. Appellant did speak with Johnson about the .22 rifle after the murder because he had reason to believe that the gun had been planted on the property to make him look like a suspect, but he did not put the .22 rifle on Johnson's property and he saw it last when he handed it to Stefan. Appellant also noted that the complainant and Griert had given him a cellular telephone so that they could call him to do work for them when needed, but after he and the complainant had an argument, the complainant took the telephone away from appellant because he had "run up" the bill. Appellant explained that he was not allowed to use the complainant's cars after their friendship ended and he was no longer allowed in the house.

10

Dr. Roger Milton, a Harris County assistant medical examiner, testified that during the autopsy of the complainant's body, he observed two gunshot wounds: one to his chest and the other to his chin and right jaw. Jennifer Clay, a DNA analyst from the HPD Crime Lab, testified that a DNA profile is the number of repeat sequences at certain locations in an individual's DNA. She explained that through testing, she was not able to obtain DNA profiles from the pool cue bag or the bullets from the rifle cartridge. Because no DNA profiles could be obtained, Clay could not draw any particular conclusions in this case.

### Cross-Examination Regarding Pending Charges

In five points of error, appellant argues that the trial court erred in prohibiting him from cross-examining two of the State's witnesses, Joseph and Stefan Kennedy, regarding indictments and criminal charges that were pending against them when they testified because they had a "strong reason . . . to 'curry the favor' of the State" and there was a causal connection or logical relationship between the witnesses' "vulnerable status" and their potential bias to testify in a manner favorable to the State.[3] Appellant asserts that, as a result, he was denied

---

[3] Appellant argues that Stefan had a strong motivation to "curry favor" with the Harris County District Attorney's office because the evidence pointed to him either as a party or possibly as the principal actor in the complainant's murder. However, appellant does not point to any evidence and the record does not reflect that Stefan was considered to be a suspect or was under investigation for the complainant's murder. Appellant also argues that Stefan had a strong motivation to curry favor with the State

11

the ability to confront the witnesses in violation of the Sixth Amendment of the United States Constitution

In a pretrial hearing, appellant's counsel told the trial court that Joseph and Stefan had pending felony charges and he wanted to cross-examine them on whether the State had made any offers or whether they were "testifying with the idea that this will be of benefit." The court agreed, "[t]here's no problem with that." The State argued that because Stefan had no impeachable convictions and his and Joseph's cases were currently pending, appellant's counsel should not be allowed to question them about the cases. *See* TEX. R. EVID. 609 (allowing impeachment of the credibility of witnesses by evidence of felony convictions or crimes involving moral turpitude when probative value outweighs prejudice). Appellant's trial counsel responded that the pending cases were material "as to the degree to which these might influence [the witness] in terms of garnering favor for

because he admitted being near the crime scene and appellant testified that he had sold the .22 rifle with the pool cue bag to Stefan just before the murder. Appellant further argues that the pending criminal cases involving guns were relevant because Stefan testified that he did not know anything about guns, even though the pending felony cases involved guns, and Stefan had testified that he thought that his pending felony cases had been reduced to misdemeanors. Finally, appellant argues that Joseph Kennedy was motivated to help the State because evidence pointed to Stefan as a party to the crime and he acted to "protect" his younger brother Stefan during police interviews and wanted to protect him to prevent "legal problems."

12

the State for [this] testimony." The trial court ruled that evidence regarding the range of punishment was inadmissible.

During his trial testimony, the State questioned Joseph about his previous conviction of the misdemeanor offense of theft by check and the two days that he had served in jail for the offense. And Joseph testified that he had not received from the State any "promises" or "deals" or "anything" for testifying. On cross-examination, appellant's trial counsel referenced the State's question on direct examination about whether Joseph had received any "deals" or "promises." The State objected, and the trial court conducted a hearing at the bench. The State argued that evidence of the pending cases was not admissible under rule 609 because the cases had not resulted in impeachable convictions and were not relevant to his testimony. The trial court ruled that appellant's trial counsel could ask about impeachable convictions, and in regard to any pending cases, it stated, "It's definitely relevant whether or not he has gotten anything in return for his testimony. You can ask whether or not those things that are pending; Are they misdemeanors or are they felonies: That's it." Appellant's trial counsel then questioned Joseph about his two pending felony cases and how many times he had spoken with the prosecutor.

In regard to Stefan, the State, on direct examination, questioned him about his two pending felony cases and the fact that he was currently in jail for an

offense.  Stefan testified that he had not been convicted of anything and believed that his felony cases had been reduced to misdemeanors.  When asked by the State whether it had made him any "promises" or "deals" of any kind for testifying in the instant case, Stefan answered that it had not and he was in court "to tell the truth." Stefan explained that his pending cases did not have anything to do with why he was testifying in appellant's case.

After Joseph and Stefan's testimony, appellant's trial counsel made the following bill of exception:

> Your Honor, at this time, had I been allowed – when Joseph Kennedy had testified, I was going to present to the Court certified copies of the two indictments that he had for the offenses pending in the 177th District Court.  They are both theft cases.  It was my intention to offer these as Defense Exhibits.  . . . That way, the jury would know.  I was going to ask him to inform the jury that these were first-degree felonies and that the punishment range for a first-degree felony is from five to ninety-nine years or life and whether or not he expected any favorable resolution of his cases based on his testimony here in court because the State had already asked him; Had there been any promises or deals made with regards to the case?
>
> With regard to Stefan Kennedy, I had the indictments in his two cases, which I'm going to mark as 9 and 10, his misdemeanor as 11.
>
> I was going to identify these and go into the range of punishment, which is theft by firearm, a State jail felony, I believe, and the other is an aggravated robbery, which is a first-degree felony – any, yet, there's a Class A misdemeanor assault – and ask him what the ranges of punishment were and whether or not he expected any favorable resolution in his cases in regards to testifying here today.

14

Through the Confrontation Clause of the Sixth Amendment, an accused enjoys the right "to be confronted with the witnesses against him" by an opportunity to cross-examine the witnesses. U.S. CONST. amends. VI, XIV; *Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S. Ct. 1431, 1435 (1986); *see Lopez v. State*, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000). This constitutional right of confrontation includes the right to cross-examine witnesses as well as the opportunity to show that a witness is biased or his testimony is exaggerated or unbelievable. *Irby v. State*, 327 S.W.3d 138, 145 (Tex. Crim. App. 2010); *Carpenter v. State*, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998). Cross-examination is proper to expose a witness's motivation to testify for or against the accused or the State, and parties are generally allowed great latitude to show "any fact which would or might tend to establish ill feeling, bias, motive, and animus on the part of the witness." *Carpenter*, 979 S.W.2d at 634 (quoting *London v. State*, 739 S.W.2d 842, 846 (Tex. Crim. App. 1987)).

However, evidence that a witness is facing pending charges is not relevant for the purpose of showing bias or a motive to testify without some "causal connection" or "logical relationship" between the evidence, which might show bias or motive such as the witness's pending charges, and the "vulnerable relationship" or potential bias or prejudice for the State. *Irby*, 327 S.W.3d at 149; *Carpenter*, 979 S.W.2d at 634–35 & n.4. At its discretion, the trial court may limit cross-

15

examination for a number of reasons such as harassment, prejudice, confusion, marginal relevance, or when the proponent does not establish the requisite causal connection or logical relationship. *Carpenter*, 979 S.W.2d at 634. We review this issue for abuse of discretion. *Irby*, 327 S.W.3d at 154.

The required "causal connection" is a matter of relevance. *See* TEX. R. EVID. 401; *Carpenter*, 979 S.W.2d at 634. However, the cross-examiner must show the relevance of the "vulnerable status" or other source of bias to the witness's testimony. *Irby*, 327 S.W.3d at 151–52. All witnesses with pending charges, or who have some other "vulnerable status" are not automatically subject to cross-examination about that status regardless of any lack of relevance to the witness's testimony. *Id*. at 152 (rejecting proposition that probationer, particularly probationer whose guilt has not yet been adjudicated, is always in vulnerable position with State). The mere existence of pending charges is not always automatically relevant to show the witness's potential bias and motive to testify favorably for the State. *See id*.

The type of evidence needed to show a causal connection or logical relationship might include testimony about the negotiations for, or existence of, a plea bargain agreement, or testimony showing that the witness believes a deal exists in the pending matter. *Carpenter*, 979 S.W.2d at 635 n. 5. A trial court does not abuse its discretion by limiting cross-examination on potential bias or motive

16

when the proponent does not establish the required causal connection or logical relationship. *See Woods v. State*, 152 S.W.3d 105, 111–12 (Tex. Crim. App. 2004) (overruling complaint about limited cross-examination when proponent's offer of proof failed to show nexus between witness's testimony and his sentence); *Carpenter*, 979 S.W.2d at 635 (overruling complaint about limited cross-examination when proponent failed to establish causal connection between pending charges and witness's testimony).

Through appellant's cross-examination, the jury heard testimony that Joseph had two pending felony criminal cases in Harris County "in this courthouse" and how many times he had talked to the district attorney. During direct examination, Joseph testified that he had not received any "promises" or "deals" in exchange for his testimony at appellant's trial.

Likewise, the State elicited testimony from Stefan that he had two pending felony criminal cases. Stefan also testified that he had one pending misdemeanor case and he was, during the instant trial, in jail. Stefan explained that the pending cases did not have anything to do with why he was testifying at appellant's trial and he had not been convicted of anything. And he had not received any "promises" or "deals" in exchange for testifying at appellant's trial. Appellant elicited additional testimony from Stefan on cross-examination that he had spoken

17

with appellant's prosecutor three times in the Harris County jail and the prosecutor's investigator was present during the conversations.

In his bill of exception, appellant sought to introduce into evidence copies of two theft indictments pending against Joseph. Specifically, he sought to elicit testimony that both were first-degree felonies that provided a punishment range of confinement for five to ninety-nine years or life and whether he expected any "favorable resolution" of his cases based on his testimony in appellant's case. As to Stefan, appellant sought to introduce into evidence copies of two felony indictments and one misdemeanor information. He wanted to elicit testimony that one offense, theft by firearm, was a state jail felony, and another, aggravated robbery, was a first-degree felony. Specifically, appellant sought to elicit testimony regarding the punishment range of the offenses and whether Stefan expected any favorable resolution to his cases based on his testimony at appellant's trial.

Appellant has not demonstrated how specifically identifying Joseph's two pending felony charges as felony theft charges and the punishment range for those offenses would tend to show that his testimony might be biased in this unrelated prosecution of appellant for murder. Nor did he demonstrate how specifically identifying Stefan's two pending felony charges as felony charges for theft by firearm and aggravated robbery and the punishment ranges for those offenses

would tend to show that Stefan's testimony in this unrelated prosecution of appellant for murder might be biased. In his bill of exception, appellant did not introduce additional facts showing any causal or logical connection between the charges pending against Joseph and Stefan and any bias based on their expectation of a deal or for more favorable treatment by the State based on their testimony in appellant's trial. Both men testified that they had not received any "promises" or "deals" for testifying in appellant's case. The admission of copies of the indictments in the pending cases and testimony about the punishment range for each offense would not have any further shown Joseph or Stefan's "vulnerable relationship" with the State or any potential motive, bias, or interest. *See Carpenter*, 979 S.W.2d at 634–35; *see Bradshaw v. State*, No. 04-11-00173-CR, 2012 WL 1648218, at *3 (Tex. App.—San Antonio May 9, 2012, pet. ref'd) (mem. op.) (finding trial court's limit on cross-examination regarding range of punishment witness on probation faced for ignoring subpoena was not abuse of discretion).

Joseph and Stephan's possible bias or interest in testifying for the State was demonstrated through their testimony elicited on direct examination and appellant's cross-examination. Appellant was otherwise afforded an opportunity for a thorough and effective cross-examination. *See Stults v. State*, 23 S.W.3d 198, 204 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) (stating that restriction on

19

cross-examination not improper when possible bias and motive of the State's witness is clear to the trier of fact and accused otherwise had opportunity for cross-examination). And appellant makes no assertion that Joseph or Stefan received a benefit from the State in exchange for their testimony at his trial. Accordingly, we hold that the trial court did not err in limiting appellant's request for further cross-examination about the specific felony charges pending against Stefan and Joseph and the punishment range of those offenses. We further hold that the trial court did not violate appellant's right to confront the witnesses against him.

We overrule appellant's five points of error.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Jennings, Bland, and Massengale.

Do not publish. TEX. R. APP. P. 47.2(b).