ACCEPTED
06-14-00228-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
7/20/2015 2:44:22 PM
DEBBIE AUTREY
CLERK

*The State does not request oral argument.*

**NO. 06-14-00228-CR**

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS

7/20/2015 2:44:22 PM

DEBBIE AUTREY
Clerk

# IN THE COURT OF APPEALS
# FOR THE SIXTH DISTRICT
# OF TEXAS AT DALLAS

---

**DAVID GARCIA REYES,**
APPELLANT

v.

**THE STATE OF TEXAS,**
APPELLEE

---

*On appeal from Criminal District Court No. 3 of Dallas County*
*In Cause Number F13-61746-J*

---

## STATE'S BRIEF

---

*Counsel of Record:*

SUSAN HAWK
CRIMINAL DISTRICT ATTORNEY
DALLAS COUNTY, TEXAS

GRACE E. SHIN
ASSISTANT DISTRICT ATTORNEY
STATE BAR NO. 24033062
FRANK CROWLEY COURTS BLDG.
133 N. RIVERFRONT BLVD., LB-19
DALLAS, TEXAS 75207-4399
(214) 653-3631
(214) 653-3643 *fax*
gshin@dallascounty.org

# TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................... i

INDEX OF AUTHORITIES.................................................................................ii

STATEMENT OF THE CASE..............................................................................1

STATEMENT OF FACTS ...................................................................................1

SUMMARY OF ARGUMENT ............................................................................5

ARGUMENT .......................................................................................................6

    RESPONSE TO ISSUE ONE: APPELLANT FAILED TO PRESERVE HIS
    CONSTITUTIONAL COMPLAINT ABOUT THE CONFRONTATION CLAUSE.
    EVEN ASSUMING APPELLANT PRESERVED ERROR, THE RECORD SHOWS
    NO VIOLATION OF THE CONFRONTATION CLAUSE. ........................................ 6

        A.    Appellant forfeited his complaint about the Confrontation
            Clause. ................................................................................... 8

        B.    The trial court's exclusion of irrelevant evidence did not violate
            the Confrontation Clause... ....................................................... 9

    RESPONSE TO ISSUE TWO: THE JUDGMENT SHOULD BE REFORMED TO
    CORRECTLY REFLECT THE OFFENSE OF WHICH APPELLANT WAS
    CONVICTED. ............................................................................................... 19

PRAYER ............................................................................................................20

CERTIFICATE OF COMPLIANCE...................................................................21

CERTIFICATE OF SERVICE ...........................................................................21

# INDEX OF AUTHORITIES

*Cases*

*Abron v. State*,
  997 S.W.2d 281 (Tex. App.—Dallas 1998, pet. ref'd) ................................20

*Arroyo v. State*,
  259 S.W.3d 831 (Tex. App.—2008 Tyler, pet. ref'd)................................12

*Asberry v. State*,
  813 S.W.2d 526 (Tex. App.—Dallas 1991, pet. ref'd) ..............................20

*Bigley v. State*, 865 S.W.2d 26 (Tex. Crim. App. 1993) .........................................19

*Billodeau v. State*,
  277 S.W.3d 34 (Tex. Crim. App. 2009) ......................................................10

*Carpenter v. State*,
  979 S.W.2d 633 (Tex. Crim. App. 1998) ....................................................10

*Davis v. Alaska*,
  415 U.S. 308 (1974)......................................................................................9

*Dewberry v. State¸*
  4 S.W.3d 735 (Tex. Crim. App. 1999) ..........................................................8

*Garcia v. State*,
  149 S.W.3d 135 (Tex. Crim. App. 2004) ......................................................9

*Gordillo v. State*,
  No. 01-13-00477-CR, 2015 Tex. App. LEXIS 1643 (Tex.
  App.—Houston [1st Dist.]  Feb. 19, 2015, no pet.) (mem.
  op., not designated for publication) ...............................................................8

*Haley v. State*,
  173 S.W.3d 510 (Tex. Crim. App. 2005) ......................................................8

*Irby v. State*,
  327 S.W.3d 138 (Tex. Crim. App. 2010) .................................................9, 10

ii

*Johnson v. State*,
433 S.W.3d 546 (Tex. Crim. App. 2014) .......................................................9

*McCullough v. State*,
No. 05-09-00201-CR, 2010 Tex. App. LEXIS 9059 (Tex.
App.—Dallas Nov. 16, 2010, pet. ref'd) (mem. op., not
designated for publication) .............................................................................9

*Nolan v. State*,
39 S.W.3d 697 (Tex. App.—Houston [1st Dist.] 2001, no
pet.) ................................................................................................................20

***Statutes***

Tex. Penal Code Ann. § 22.011(a)(2) (West 2011)................................................19

***Other Authorities***

Ryan M. Gibson, *What is the difference between the DREAM Act
and DACA (Deferred Action for Childhood Arrivals)?* (June
12, 2013), http://ryangibsonlaw.com/what-is-the-difference-
between-dream-act-and-daca-deffered-action-for-childhood-
arrivals .........................................................................................................15

*TRIBPEDIA: Dream Act*, THE TEXAS TRIBUNE (April 19, 2015),
http://www.texastribune.org/tribpedia/dream-act/about ..............................15

U.S. Citizenship and Immigration Services,
http://www.uscis.gov/humanitarian/consideration-deferred-
action-childhood-arrivals-daca ....................................................................15

U.S. Const. amend. VI ..........................................................................................9

***Rules***

Tex. R. App. P. 33.1(a) ..........................................................................................8

Tex. R. App. P. 43.2(b)........................................................................................19

**TO THE HONORABLE COURT OF APPEALS:**

The State of Texas submits this brief in response to the brief of appellant, David Garcia Reyes.

## STATEMENT OF THE CASE

Appellant was charged by indictment with the offense of sexual assault of a child. (CR: 15). Following a trial on his plea of "not guilty," a jury found appellant guilty of sexual assault as charged and sentenced him to fifteen years' confinement. (CR: 125).

## STATEMENT OF FACTS

When complainant Andrew Ramirez[1] was fifteen years old, he began working as a volunteer in the recording room of Templo Betania, the church he and his family attended. (RR8: 17-20). Appellant, who was one of the leaders at the church, was in charge of the recording room during that time. (RR8: 20-22). Over time, appellant began to give the complainant spending money and rides home from church. (RR8: 24-25). The complainant grew to trust appellant and began to confide in him about "crushes," his grades at school, and "just everything in general." (RR8: 25).

---

[1] "Andrew Ramirez" was the pseudonym used at trial. (RR8: 14 -15).

1

The complainant celebrated his sixteenth birthday on July 19, 2013. (RR8: 25-26). About a week later, the complainant had an encounter with a police officer while skateboarding on church grounds with a friend during service. (RR8: 27). The complainant fled from the officer into the church and found appellant. (RR8: 27). Appellant took the complainant into the conference room next to the recording room and, there, the complainant told appellant about his encounter with the officer. (RR8: 28). The complainant was afraid he would get into trouble with his parents, but appellant told him he would take care of it and not to worry. (RR8: 28). Appellant then hugged the complainant and tried to touch the complainant's genitals over his shorts. (RR8: 29). The complainant stopped him, but appellant told him they would not get out of there unless "it happened." (RR8: 29). The complainant relented and appellant touched his genitals over his shorts. (RR8: 30). Appellant then slid his hand inside the complainant's shorts and grabbed his penis. (RR8: 30). The complainant pulled away after several seconds and appellant left the room, saying he would find the complainant's mother and explain the skateboarding situation to her. (RR8: 30-31).

Appellant returned with the complainant's mother and the three discussed the situation. (RR8: 31-32). In the course of the conversation, appellant obtained

2

consent from the complainant's mother to have the complainant spend the night at his house the following Thursday or weekend. (RR8: 32).

Appellant picked the complainant up from his home the following Thursday evening in the church's truck. (RR8: 32-33). Appellant drove to a field where the church was planning to build its new facility and parked the truck. (RR8: 33). After talking for a while, appellant stepped out of the truck and walked over to the complainant's side of the truck. (RR8: 34). Appellant coaxed the complainant into pulling down his pants and "draws," fondled the complainant's penis, and then put the complainant's penis into his mouth. (RR8: 34-35). Appellant stopped after the complainant ejaculated, and drove them to Sonic for food. (RR8: 36).

The next day, appellant took the complainant to his house for a sleepover. (RR8: 38). Appellant's wife and three children were home that night, as well as eighteen-year-old Danny, who was another church volunteer spending the night there. (RR8: 38-39). The complainant and Danny shared appellant's daughter's bedroom that night. (RR8: 40). At some point before going to bed, however, appellant sent Danny to the shower and performed oral sex on the complainant. (RR8: 40).

Thereafter, appellant took the complainant to the field or to his home about once a week and performed oral sex on him. (RR8: 41). Throughout this period,

3

appellant bought the complainant a cell phone, gave him spending money, and bought him clothes. (RR8: 42).

One night in October, the complainant finally told his friend, Karla Delgado, what appellant was doing to him. (RR8: 44-45). Karla and the complainant had met when Karla was a senior and the complainant was a sophomore at their high school. (RR8: 49-50). At the time of this outcry, Karla was a freshman at Eastfield Community College. (RR8: 184-185, 199-200). Shortly after their conversation, Karla reported the matter to a professor at Eastfield whose husband was a sergeant in the Dallas Police Department. (RR8: 184, 199-200).

A detective soon came to the complainant's school and interviewed him. (RR8: 54). The complainant also gave a written statement to the detective. (RR8: 54). The detective returned to the school the next day and had the complainant take her to the field where appellant had repeatedly performed oral sex on him. (RR8: 55). They then went to police headquarters, where the complainant made a recorded one-party consent call to appellant. (RR8: 55-56). Appellant was arrested later that day. (RR8: 227; RR9: 7-8). An indictment for sexual assault of a child subsequently issued. (CR: 15).

At appellant's trial, the State's witnesses included the complainant, Karla Delgado, the community college professor to whom Karla had confided, the

4

detective assigned to the case, and the counselor from the Dallas Children's Advocacy Center who had treated the complainant. A transcript of the one-party consent call was among the items admitted into evidence. (RR8: 95-100; State's Ex. 50).[2] The defense witnesses included a number of church members, appellant's wife, the complainant's mother, and appellant himself. Appellant denied ever touching the complainant's genitals or performing oral sex on him. (RR10: 29, 32-33, 36). The defense theory at trial was that the complainant lied about the abuse. The defense attempted to introduce evidence of the complainant's undocumented-immigrant status in an attempt to bolster this theory, but the trial court excluded such evidence. (RR8: 144-148; RR9: 142-150; RR10: 7-11). The jury ultimately found appellant guilty as charged in the indictment. (RR10: 88).

## SUMMARY OF ARGUMENT

*Response to Issue One:* Appellant failed to preserve his complaint about a Confrontation-Clause violation for appeal. Even assuming appellant preserved this issue for appeal, the record shows appellant sought to offer evidence of the complainant's illegal-immigrant status and desire for legal status without any

---

[2] State's Exhibit 49, which was the actual recording of the call, was also admitted. (RR8: 95-100). The recording, however, was in Spanish and a certified translation of the recording was admitted as State's Exhibit 50. (RR8: 95-100).

5

evidence connecting it to the complainant's alleged motive in this case. The record shows no violation of the Confrontation Clause and no abuse of discretion in the trial court's decision to exclude this evidence

*Response to Issue Two*: The written judgment should be reformed to correctly reflect the offense of which appellant was convicted.

## ARGUMENT

### RESPONSE TO ISSUE ONE: APPELLANT FAILED TO PRESERVE HIS CONSTITUTIONAL COMPLAINT ABOUT THE CONFRONTATION CLAUSE. EVEN ASSUMING APPELLANT PRESERVED ERROR, THE RECORD SHOWS NO VIOLATION OF THE CONFRONTATION CLAUSE.

In issue one, appellant contends the trial court violated his rights under the Confrontation Clause of the United States Constitution when it "refused to allow [him] to cross-examine the complainant and present evidence pertaining to the complainant's immigration status and his desire to become a U.S. citizen." (Appellant's Brief, p. 23).

The record shows the State first raised the issue of the complainant's immigration status by a pretrial oral motion in limine. (RR4: 9). The prosecutor asserted that the complainant was currently on the Dream Act,[3] and had inquired about a U Visa when they met with him. (RR4: 9-10). The prosecutor was

_____

[3] No explanation of the Dream Act appears in the record.

6

uncertain of appellant's immigration status, and asked the court for a motion in limine regarding "immigration issues for everyone." (RR4: 10). The defense countered that the complainant's immigration status was relevant to establish motive. (RR4: 11). When asked by the court for evidence connecting the complainant's immigration status to motive, defense counsel simply reiterated her belief that the complainant's interest in obtaining a U Visa went "directly to his motive." (RR4: 12). The court stated it would consider the matter and ruled, "At this time I'm gonna grant the motions in limine that the State is requesting or you can have me address that issue before trial starts." (RR4: 12).

The defense subsequently tried to introduce evidence of the complainant's immigration status on three separate occasions: (1) during cross-examination of the complainant; (2) through its proffer of witness Jonathan Landeros; and (3) through its proffer of photographs of the complainant's Twitter pages. (RR8: 144-148; RR9: 142-150; RR10: 7-11). The trial court excluded the evidence on each occasion. Appellant appears to be claiming that the trial court's ruling in each instance violated his right of confrontation. His argument about the Confrontation Clause, however, is raised for the first time on appeal.

**A. Appellant forfeited his complaint about the Confrontation Clause.**

To preserve error for appellate review, the record must show the following: (1) a timely and specific objection, request, or motion by the complaining party; and (2) a ruling on the request, objection, or motion; or the complaining party's objection to the trial court's refusal to rule. *See* Tex. R. App. P. 33.1(a); *Haley v. State*, 173 S.W.3d 510, 516 (Tex. Crim. App. 2005). Complaints about a violation of the Confrontation Clause may be forfeited by a failure to comply with rule 33.1(a). *See, e.g., Dewberry v. State*¸ 4 S.W.3d 735, 752 (Tex. Crim. App. 1999) (holding defendant waived potential error under the Confrontation Clause by failing to comply with rule 33.1(a))

Appellant made no reference to the Confrontation Clause at trial. In each instance in which appellant sought to introduce evidence of the complainant's immigration status, he merely claimed it was necessary to establish the complainant's motive. (RR4: 11; RR8: 47-48; RR9: 148-150; RR10: 7-11). Appellant has, therefore, forfeited his right to complain on appeal about the violation of the Confrontation Clause. *Compare Gordillo v. State*, No. 01-13-00477-CR, 2015 Tex. App. LEXIS 1643, at *9-10 (Tex. App.—Houston [1st Dist.] Feb. 19, 2015, no pet.) (mem. op., not designated for publication) (holding defendant's argument that the complainant's immigration status was relevant to credibility did not preserve his complaint about the Confrontation Clause);

8

*McCullough v. State*, No. 05-09-00201-CR, 2010 Tex. App. LEXIS 9059, *7-8 (Tex. App.—Dallas Nov. 16, 2010, pet. ref'd) (mem. op., not designated for publication) (holding defendant's objection that the evidence was relevant to motive did not preserve his complaint about the violation of the Confrontation Clause).

**B. The trial court's exclusion of irrelevant evidence did not violate the Confrontation Clause.**

Even assuming no procedural bar, appellant fails to show a violation of the Confrontation Clause. The Confrontation Clause, found in the Sixth Amendment of the United States Constitution, guarantees a criminal defendant the right to be confronted with the witnesses against him. *See* U.S. Const. amend. VI; *Garcia v. State*, 149 S.W.3d 135, 140 (Tex. Crim. App. 2004). This includes the right to cross-examine the witnesses and the opportunity to show that their testimony is exaggerated or unbelievable. *Irby v. State*, 327 S.W.3d 138, 145 (Tex. Crim. App. 2010). The exposure of a witness's motivation in testifying is a proper and important function of the right of cross-examination, and is "always relevant as discrediting the witness and affecting the weight of his testimony." *Johnson v. State*, 433 S.W.3d 546, 551 (Tex. Crim. App. 2014) (quoting *Davis v. Alaska*, 415 U.S. 308, 316-17 (1974)).

9

This does not mean, however, that a defendant has free rein on cross-examination. As in other contexts, a defendant who wishes to introduce evidence of a potential bias must first establish its relevance. *See generally Carpenter v. State*, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998) (discussing relevance requirement for admitting evidence of a pending criminal action against the defendant). Specifically, a defendant who wishes to introduce evidence of a witness's immigration status must first establish "some causal connection or logical relationship" between the immigration matter and the witness's potential bias. *See id.*; *see also Irby*, 327 S.W.3d at 151 (discussing how *Carpenter* and other cases require "some logical relevance of the pending charge, probation or immigration status, or other alleged source of bias to the witness's testimony."). A trial court's decision to limit cross-examination is reviewed under an abuse-of-discretion standard. *See Billodeau v. State*, 277 S.W.3d 34, 43 (Tex. Crim. App. 2009).

### *On Cross-Examination of the Complainant*

The defense first attempted to introduce the immigration issue during its cross-examination of the complainant. Defense counsel argued that the complainant's sole purpose for staying at appellant's house on one of the nights was so appellant could take him to the Social Security Administration Office the

10

next day. (RR4: 144-145). Although not entirely clear, defense counsel seemed to suggest that the complainant needed to go to the Social Security Administration Office in connection with his attempts to obtain DACA, which stands for Deferred Action for early Childhood Arrivals. (RR4: 145). Defense counsel argued that the complainant did not obtain his DACA until appellant helped him. (RR4: 145). According to defense counsel, a non-citizen under DACA received work authorization and a valid social security card, which allowed the non-citizen to obtain a driver's license and possibly continue school. (RR8: 145). Defense counsel also claimed the complainant was "real interested in the U Visa." (RR8: 145).

When the court asked how the defense planned to present this evidence, defense counsel stated she had witnesses who could testify that the complainant was asking about U Visas prior to "this incident" and that he was "real interested in getting some type of legal status." (RR8: 145). Defense counsel also explained why the complainant might want a U Visa: "The difference between a U Visa and a DACA, a U Visa actually gives you permanent residency. You - - five years, you become a permanent resident - - you become a citizen, then you can apply for everyone." (RR8: 145-146).

After hearing all arguments, the trial court ruled that the defense could not ask the complainant about his immigration status *at that time*. (RR8: 147). The trial court's ruling was not categorical. If the defense later presented a witness to testify to these issues, the defense would then be permitted to recall the complainant to question him about motive, since the defense's position was that "these things are reasons why he would have lied on the defendant." (RR8: 147-148). At the time of this ruling, the defense had not yet presented any witnesses to establish the relevance of the complainant's immigration status to motive. The trial court's ruling was, therefore, not an abuse of discretion. *Cf. Arroyo v. State*, 259 S.W.3d 831, 835-36 (Tex. App.—2008 Tyler, pet. ref'd) (holding the trial court did not abuse its discretion in excluding evidence of witness's immigration status because defendant failed to establish its relevance).

### *Through Proffer of Jonathan Landeros's Testimony*

The second time the defense attempted to introduce the complainant's immigration status was early in the presentation of its case on guilt/innocence. In a hearing outside the jury's presence, the defense presented the testimony of nineteen-year-old Jonathan Landeros, who had known the complainant since Landeros was eleven. (RR9: 142). The two had grown up in the same church. (RR9: 143). Landeros testified that the complainant was an illegal immigrant.

12

(RR9: 143). When asked whether this concerned the complainant, Landeros replied, "Yes. Yeah, it did, because he would struggle to do everything. His parents never really - - when the DACA came out, he couldn't get that right when it got out and he was kind of like - - he was struggling with that and he was kind of, like, scared about not getting it." (RR9: 143). Landeros testified that the complainant's immigration status was "very important" to him and that he had difficulty obtaining his DACA. (RR9: 144). When asked how the complainant finally obtained his DACA, Landeros was not certain: "I'm not quite sure how, but I'm pretty sure not through his parents, because they had no money. He ended up getting - - he told me he had to go get his fingerprints on June 13th from last year and then somewhere around early October, he told me - - he asked me where he could get his social security." (RR9: 144).

The defense then inquired into whether the complainant was interested in obtaining "more status" in addition to the DACA:

Q. Did he talk about other ways of getting more status than just the - - just the DACA?

A. He never mentioned anything, but he was always asking me and some other people from church, talking about it.

Q. The immigration status?

A. Yeah, about the immigration status.

13

Q.      Now, did he do a lot of research on - - on immigration?

A.      Yes.  He would always be sending me links about where –
        where to go start off with DACA and stuff.  He was the one that
        was always on top of that.

Q.      So he was - - he was finding different ways that he could get
        some type of documentation?

A.      Yes, he was exploring different ways on how to attain it.

Q.      Now, is he the only one of the siblings that don't have any
        immigration status?

A.      The only ones that are legal are his two little sisters; his parents
        are illegal as well.

Q.      And you know all of this based on information that he gave you
        directly?

A.      Yeah.  Well, I - - yeah, he - - he told me.  I know.  My parents
        know.

(RR9: 144-145).[4]

Upon conclusion of Landeros's proffered testimony, the State argued that

the complainant's interest in immigration, alone, was insufficient to tie it to motive

and that the complainant's illegal-immigrant status was highly prejudicial.  (RR9:

146-147).  In response, defense counsel claimed she could develop motive "based

---

[4]After completing its questioning on immigration, defense counsel also briefly questioned
Landeros about his knowledge of allegations that the complainant used church computers to
access porn.  (RR9: 145-146).  Landeros testified he had no knowledge of this allegation.  (RR9:
145-146).

14

on better immigration status." (RR9: 148). Defense counsel argued that the complainant's delay in getting the Dream Act[5] and his recent inquiries into a U Visa was relevant to his motive in this case. (RR9: 148). Counsel elaborated in the following way:

> Oh. He asked the State, he asked the police officer, he's asking people, he's doing research on how to get a - - how to get a U Visa. The bottom line is if he gets a U Visa, you can get a U Visa in a month if you demonstrate that you're a sex crime victim.
>
> Moreover, you could lose your DACA if you get found of a - - guilty of a Class A misdemeanor, which involves moral turpitude, which would be entering someone's, you know WIFI.
>
> I think in terms of, like, developing our motive, I think, you know, the fact that he's doing things that could cause him to lose what status he has and we have information that he could get better status if he's a sex crime victim and it all happens around the same time that he makes these allegations - -

(RR9: 148).

---

[5] Counsel likely meant to refer to DACA rather than the Dream Act. The record indicates that the parties confused DACA with the Dream Act and appellant makes the same mistake on appeal. (Appellant's Brief, p. 26; RR9: 147). The two, however, are different acts. DACA allows certain individuals who arrived in the United States as children to receive deferred action on removal, as well as work authorization, for a a two-year period. *See* U.S. Citizenship and Immigration Services, http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca. An individual under DACA may also obtain a driver's license and social security number. *See* Ryan M. Gibson, *What is the difference between the DREAM Act and DACA (Deferred Action for Childhood Arrivals)?* (June 12, 2013), http://ryangibsonlaw.com/what-is-the-difference-between-dream-act-and-daca-deffered-action-for-childhood-arrivals. The Texas Dream Act, in contrast, allows certain undocumented students to pay in-state college tuition. *See TRIBPEDIA: Dream Act*, THE TEXAS TRIBUNE (April 19, 2015), http://www.texastribune.org/tribpedia/dream-act/about.

The trial court interrupted defense counsel at this time and stated, "Miss Kelly, even if that were true, the only person who could testify to this, that I've heard, is you, and you can't testify." (RR9: 148-149). The court correctly pointed out that Landeros did not testify to what defense counsel had just argued. (RR9: 149). The following exchange then ensued between the court and defense counsel:

DEFENSE: Can the Court take judicial notice of what a U Visa - -

COURT: No.

DEFENSE: Or do I need to bring - - no?

COURT: Because you need to put it in front of the jury. How do you plan on doing that? You gonna testify to it?

DEFENSE: No, huh-uh.

COURT: I mean, what about this whole - - didn't you say he's asking this person and this person and this person - - the only thing this young man can testify to is that we had discussions about his immigration status.

DEFENSE: Right.

COURT: And that's all he can testify to.

DEFENSE: Correct. And I think he can testify, your Honor, to the fact that he's been trying to get DACA. I think we can - -

COURT: But how does that tie to this allegation?

DEFENSE: The way that it ties to the allegation, your Honor, is DACA - - you could lose your DACA status if you have a Class A misdemeanor.

16

(RR9: 149-150). The trial court then ruled that Landeros's testimony was inadmissible. (RR9: 150).

In sum, Landeros's testimony was that the complainant worried about obtaining DACA status, did "a lot of research" into DACA and immigration, and obtained DACA status. Landeros also testified that the complainant's immigration status was very important to him. Landeros said nothing, however, to connect any of this to a possible motive on the part of the complainant. As pointed out by the court, the only "evidence" linking the immigration issue to motive was defense counsel's arguments to the court. (RR9: 148-149). Under these circumstances, the trial court's exclusion of Landeros's testimony was not an abuse of discretion.

### *Through Proffer of Twitter Pages*

The defense made a final attempt at establishing a link between the complainant's immigration status and motive towards the end of the guilt/innocence phase. In a hearing outside the jury's presence, the defense sought to introduce photographs of the complainant's Twitter account through Jahaziel Benavides, a church member who had testified for the defense the previous day. (RR9: 198, 201; RR10: 7). Benavides has apparently provided the photographs of the complainant's Twitter account to defense counsel. (RR10: 7). The court asked defense counsel what the photos would prove, and defense counsel replied, "I think

17

there's - - in this it would prove some elements of motive - - fact that it specifically talks about scholarship, wanting to go to college, and he can't go to - - you know, he can't go to college without - - it's gonna be difficult to get any scholarship if you're not a citizen." (RR10: 7-8). The State pointed out that the majority of the twitter pages showed the use of inflammatory language by the complainant, was irrelevant to motive, and was an attempt by the defense to damage the complainant's character. (RR10: 9-10). The court admitted the Twitter pages for record purposes only. (RR10: 10-11).

Appellant complains on appeal of the exclusion of two particular Twitter pages. (Appellant's Brief, p. 30). One page shows the following tweet: "[F]uck man looking for scholarships while not being a citizen and all that is the hardest shit ever." (Defense Ex. 2; RR11: 176).[6] Another tweet from that date reads, "[L]ike i gotta do community college because of the dream act." (Defense Ex. 2; RR11: 177).[7]

The two foregoing Twitter photos show the complainant's apparent frustration with planning for college as a non-citizen. Nothing in either photo

---

[6]As pointed out in appellant's brief, this page has a label, marking the exhibit as "Defendant's Exhibit 67," which has been crossed out. (Appellant's Brief, p. 30).

[7]Appellant refers to this particular page as the one marked with the crossed-out label of "Defendant's Exhibit 68." (Appellant's Brief, p. 30).

18

shows how the complainant's non-citizen status somehow motivated him to make the allegations of sexual assault against appellant. Moreover, the two Twitter photos in question are both dated September 15, 2014. The complainant made his outcry to Delgado and spoke with police about the sexual assault in October of 2013. There is no indication in the record of how these two tweets, posted almost a year after the complainant reported the sexual assault, are relevant to the complainant's motive in this case. Under these circumstances, the trial court's exclusion of the Twitter pages was not an abuse of discretion.

For the foregoing reasons, issue one should be denied.

### RESPONSE TO ISSUE TWO: THE JUDGMENT SHOULD BE REFORMED TO CORRECTLY REFLECT THE OFFENSE OF WHICH APPELLANT WAS CONVICTED.

In issue two, appellant asks that the judgment be reformed to correctly reflect the offense of which he was convicted. The State agrees.

Appellant was charged with and convicted of the offense of sexual assault of a child. (CR: 15; RR10: 88). *See* Tex. Penal Code Ann. § 22.011(a)(2) (West 2011). The written judgment, however, reflects that he was convicted of "SEXUAL CONTINUOUS ASSAULT OF A CHILD." (CR: 125). Where, as here, the record contains the necessary information to do so, the court on appeal has the authority to modify the incorrect judgment. Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993); *Abron v. State*, 997 S.W.2d

19

281, 282 (Tex. App.—Dallas 1998, pet. ref'd). "An appellate court has the power to correct and reform a trial court judgment 'to make the record speak the truth when it has the necessary data and information to do so, or make any appropriate order as the law and nature of the case may require.'" *Nolan v. State*, 39 S.W.3d 697, 698 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (quoting *Asberry v. State*, 813 S.W.2d 526, 526 (Tex. App.—Dallas 1991, pet. ref'd)).

The State asks that this Court grant issue two and modify the written judgment to reflect that appellant was convicted of sexual assault of a child.

## PRAYER

The State prays that this Honorable Court modify the judgment of the trial court and affirm the judgment as modified.

Respectfully submitted,

/s/ Grace E. Shin

Susan Hawk
Criminal District Attorney
Dallas County, Texas

Grace E. Shin
Assistant District Attorney
State Bar No. 24033062
Frank Crowley Courts Bldg.
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3631
(214) 653-3643 *fax*
gshin@dallascounty.org

**<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that the foregoing brief, exclusive of the contents listed in rule 9.4(i), is 4,321 words in length according to Microsoft Word, which was used to prepare the brief. *See* Tex. R. App. P. 9.4(i).

/s/ Grace E. Shin
_____
Grace E. Shin

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on July 20, 2015, a true copy of this Brief was served on appellant's attorney, Kathleen A. Walsh, via eFile.TXCourts.gov.

/s/ Grace E. Shin
_____
Grace E. Shin